In re HEALTHCO INTERNATIONAL,
INC., Debtor.

William A. BRANDT, Jr.,
Trustee, Plaintiff,

v.

HICKS, MUSE & CO., INCORPORATED,
et al., Defendants.

Bankruptcy No. 93–41604–JFQ.
Adv. No. 95–4154.

United States Bankruptcy Court,
D. Massachusetts.

May 17, 1996.

J. Joseph Bainton, Jose Baez, Ross & Hardies, New York City, Michael A. Khoury, Cohn & Kelakos, Boston, MA, for William A. Brandt, Trustee.

Thomas G. Rafferty, Cravath, Swaine & Moore, New York City, Arnold P. Messing, Choate, Hall & Stuart, Boston, MA, for Lazard Freres & Co.

Mark N. Parry, Moses & Singer, New York City, for Gemini Partners, Arthur M. Goldberg.

Mark K. Schonfeld, Testa, Hurwitz & Thibeault, Boston, MA, for Wand Partners, Mercury Asset Management, Life Partners Group.

David C. Fixler, Rubin & Rudman, Boston, MA, for Robert Casey, Helen Cyker.

Andrew A. Kress, Cherise Wolas Kasica, Arthur Steinberg, Kaye, Scholer, Fierman, Hays & Handler, New York City, for Kaye, Scholer, Fierman, Hays & Handler.

Edwin G. Schallert, Debevoise & Plimpton, New York City, for Chancellor Trust Co., Chancellor Capital Management.

David A. Parke, Bulkley, Richardson & Gelinas, Springfield, MA, for Cramer, Rosenthal, McGlynn.

H. Bissell Carey, III, John E. Tener, Robinson & Cole, Boston, MA, Joseph L. Clasen, Robinson & Cole, Stamford, CT, for Chrysler Capital Corp.

Dennis E. Glazer, Matthew Gluck, Davis, Polk & Wardwell, New York City, for J.P. Morgan.

Gary L. Weiner, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Vincent A. Mai, Thomas L. Kempner.

Hugh J. Gorman, III, Hinckley, Allen, Snyder & Comen, Boston, MA, for Joel Lewin.

Christopher T. Vrountas, Cooke, Clancy & Gruenthal, Boston, MA, for Marvin Cyker.

Peter T. Wechsler, Warner & Stackpole, Boston, MA, for Freshfields, Nabarro Nathanson.

Louis Goodman, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, for Skadden, Arps, Slate, Meagher & Flom.

Darragh Kasakoff, Seder & Chandler, Worcester, MA, for Richards, Layton & Finger Martineau Walker.

Robert Seder, Seder & Chandler, Worcester, MA, for Weil, Gotshal & Manges.

James F. Wallack, Goulston & Storrs, Boston, MA, for Morgan Stanley & Co.

Nancy Lazar, Davis, Polk & Wardwell, New York City, for J.P. Morgan & Co., Inc.

Mark D. Cress, Bulkley, Richardson & Gelinas, Springfield, MA, for Cramer, Rosenthal, McGlynn.

Kathleen Donius, Michael Jankowski, Reinhart, Boerner, Van Deuren, Norris & Rieselback, Milwaukee, WI, for Valuation Research Corp.

Vincent Amoroso, Parker, Coulter, Daley & White, Boston, MA, for Robert Mulcahy, III.

Timothy C. Blank, Dechert, Price & Rhoads, Boston, MA, for Bar & Karrer.

John Gilmore, Hill & Barlow, Boston, MA, for 'The Airlie Group'.

Phillip N. Smith Jr., Jeffrey A. Carter, Robert Elkin, Scott R. Jacobs, Mike McKool, Jr., Michael A. Piazza and Melanie G. Cowart, McKool Smith, PC, Dallas, TX, for 'The Hicks, Muse Group'.

Steven M. Pesner, Akin, Gump, Strauss, Hauer & Feld, New York City, for 'The Apollo Group'.

Christian M. Hoffman, Foley, Hoag & Eliot, Boston, MA, for Coopers & Lybrand.

William J. Hanlon, Goldstein & Manello, PC, Boston, MA, for Conseco.

Daniel J. Lyne, Hanify & King, Boston, MA, for Ray Doherty.

### OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

This is yet another case of a leveraged buyout gone sour. In May of 1991, management of Healthco International, Inc. ("Healthco") escaped from a proxy contest by causing all the company's capital stock to be sold to a "white knight" in a leveraged buyout (the "LBO"). Healthco filed a chapter 11 petition with this court on June 9, 1993. The case was soon converted to chapter 7.

William A. Brandt, Jr., the chapter 7 trustee (the "Trustee"), brings this complaint against sixty-five defendants and the entire class of selling stockholders, virtually everyone who had anything to do with the LBO. In addition to the selling shareholders, the defendants are the buyer, financing banks, debenture holders, directors, officers, controlling shareholders, financial advisors, lawyers and accountants. The complaint contains 22 counts. It includes causes of action based upon fraudulent transfer law, statutory law governing shareholder distributions, principles of unjust enrichment, fiduciary obligations of directors and controlling shareholders, breach of contract, negligence, gross negligence and bad faith. Since the complaint's filing, the Trustee has negotiated a $10 million settlement with the financing banks. I have previously dismissed as to certain selling shareholders the counts for fraudulent transfers and excessive shareholder distributions. I did so because the payments to these shareholders were made by the buyer rather than by Healthco.

Now before me are two motions to dismiss, one by Lazard Freres & Co., Inc. ("Lazard"),

Healthco's financial advisor, and the other by Gemini Partners, L.P. ("Gemini") and Arthur M. Goldberg ("Goldberg"). Gemini is the Healthco shareholder who initiated the proxy contest that precipitated the LBO; Goldberg was a director of Healthco and is Gemini's controlling shareholder. Both motions are based on Rule 7012(b)(6) of the Federal Rules of Bankruptcy Procedure, asserting the complaint fails "to state a claim upon which relief can be granted...."[1] Gemini also seeks to dismiss the complaint under Rule 7009(b), which provides that "circumstances constituting fraud ... shall be stated with particularity".[2] In addition, the motions present matters not referred to in the complaint. Lazard relies in part upon the wording of its engagement agreement with Healthco. Gemini and Goldberg point to Gemini's settlement agreement with Healthco. To the extent the motions are based on these documents, I treat them as motions for summary judgment.[3]

## I. FACTS

 Because the movants contend the complaint states no claim against them, I construe the complaint in the light most favorable to the Trustee, and I take its allegations to be true.[4] The uncontested documents relied upon by the movants are also taken at face value.

The Trustee paints a lurid picture of greed and breach of duty causing the collapse of a sizeable company, with attendant injury to creditors and employees. Prior to its demise, Healthco was a major distributor of dental supplies, equipment and services to providers of dental care throughout the United States, Canada and Western Europe. It was incorporated under the laws of Delaware and had its principal office in Massachusetts. Healthco's capital stock was traded over the counter and quoted on the NASDAQ Market System. Although the company had been successful in the past, its more recent earnings record left management vulnerable. In 1989, Healthco lost $21.887 million, which included a nonrecurring charge of $29.694 million for the cost of restructuring its distribution system.

On May 3, 1990, Gemini publicly disclosed that it owned 9.96% of the outstanding shares of Healthco. It soon commenced a proxy contest to remove the incumbent board. Facing a threat to their employment and a likely decline in the value of their stockholdings, members of Healthco's top management were eager to cash out. Healthco retained Lazard, a New York investment banker, on June 18, 1990. In Lazard's letter agreement fixing the terms of the engagement, Lazard promised Healthco it would "consider the appropriateness of various financial and acquisition alternatives which may merit consideration" and would "be available to evaluate any transaction in which [Healthco] is a participant, including without limitation any ... leveraged buyout." Lazard stated it had "become familiar over a period of time with [Healthco's] business" and that the engagement would "enable" it "to approach various situations not simply on a transactional basis but rather from a long-time perspective...." Lazard was retained as Healthco's "exclusive representative with respect to the foregoing" for one year. The letter agreement makes no mention of any future "fairness" opinion. Lazard's compensation was largely dependent upon a sale of Healthco taking place within the agreement's one-year period, or within six months thereafter as a result of discussions in which it participated. Its fee was to be 1% of the sales price, payable in cash, against which a $250,000 initial "financial advisory fee" was to be credited.

Lazard then searched for a "white knight" who would rescue management from the looming proxy contest. It held discussions with about fifty potential buyers, soon centering its efforts on the eventual buyer, Hicks, Muse & Co., Incorporated ("Hicks,

---

1. Fed.R.Bankr.P. 7012(b)(6).

2. Fed.R.Bankr.P. 7009(b).

3. Fed.R.Bankr.P. 7012(b).

4. *See Garita Hotel Ltd. Partnership v. Ponce Fed. Bank,* 958 F.2d 15, 17 (1st Cir.1992); *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990); 5A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1357 (1990).

Muse"). Hicks, Muse is a Dallas-based investment banking firm established in 1989 which specialized in leveraged buyouts.

On September 4, 1990, pursuant to board approval, Healthco executed a merger agreement with HMD Acquisition Corp. ("HMD Acquisition"), which Hicks, Muse had organized on August 31, 1990 solely for the purpose of effecting the LBO. HMD Acquisition was a wholly-owned subsidiary of HMD Holding Co., Inc. ("HMD Holding"), organized by Hicks, Muse on the same day for the same purpose. The merger agreement contemplated the sale or cancellation of all Healthco's outstanding capital stock through a two-step process. HMD Acquisition was first to make a tender offer for the shares at a cash price of $19.25 per share. Next, through the merger, shareholders who did not accept the tender offer were to have their stock cancelled and be paid a $19.25 per share cash price. Consummation of the merger was conditioned upon various events, including Hicks, Muse obtaining financing for the transaction and Healthco's auditors certifying financial statements for the twelve months ended December 29, 1990 which showed earnings before interest, taxes, depreciation and amortization ("EBITDA") of not less than $38 million.

With a merger partner in hand, Healthco's management next negotiated a settlement with Gemini, its opponent in the proxy contest then being waged for the election of directors at the shareholders' meeting scheduled for September 25, 1996. Under the terms of the settlement agreement signed on September 19, 1990, a new board was agreed upon, Gemini was to terminate its proxy solicitation, Healthco was to reimburse Gemini for its out-of-pocket expenses incurred in the contest, the parties' litigation was to terminate and mutual releases were to be exchanged. On November 2, 1990, Healthco paid Gemini $2,184,620.55 in full discharge of its reimbursement obligation.

Healthco's financial condition continued to worsen. In February of 1991, a preliminary draft of the 1990 audited financial statement became available. It disclosed that in 1990 Healthco had a net loss of about $5 million and EBITDA of only $21.8 million. The EBITDA figure was far below the $34.4 million which management had predicted for 1990 and which was a condition to the financing committed to Hicks, Muse by a consortium of banks led by Manufacturers Hanover Trust Company. The principal reason for this large variance was that the certified physical inventory value was $17.2 million less than the figure Healthco carried on its books.

The reality disclosed by the audit should have come as no surprise to Healthco's directors and advisors, even though Healthco had been reporting to its shareholders it was making money in each of its first three quarters of calendar 1990. These interim (and unaudited) financial statements were based upon Healthco's use of a method of accounting which recorded current inventory through use of estimated gross profit as a percentage of sales. Utilization of such a gross profit method, however, requires a system of internal inventory controls to be in place so that current inventory can be accurately computed. Healthco had no such system. It maintained no perpetual inventory records. The inaccuracy of its estimated gross profit method of accounting had been demonstrated over and over again, going back to at least 1987. The year-end physical inventory for each of those prior years disclosed an inventory amount which was materially less than the figure carried on Healthco's books.

Healthco, Hicks, Muse and their advisors were nevertheless intent on consummating a sale. There was a lot of money in the transaction for all the participants, including Healthco's management, which held a substantial stock interest. Never mind that the transaction would render the company insolvent or, at the very least, create a grave risk of insolvency. Ignoring all evidence that Healthco was currently operating at a loss, Hicks, Muse prepared financial projections on the assumption there would be no material adverse change in Healthco's condition after December 29, 1990. On March 1, 1991, Hicks, Muse proposed that the tender offer and merger go forward at a cash price of $15 per share. By letter dated March 26, 1991, Lazard opined to Healthco's board that the

proposed cash consideration of $15 per share to be paid to Healthco's stockholders "is fair, from a financial point of view, to such stockholders." On that day, the board approved the transaction by a vote of five to two. Goldberg voted with the majority. Healthco and HMD Acquisition immediately signed a second merger agreement providing for a cash price of $15 per share. Healthco's stockholders quickly ratified the agreement.

HMD Acquisition thereafter issued a tender offer at $15 per share, which was followed by a cash-out merger at the same price. The LBO closed on May 22, 1991, effective as of April 30, 1991. Shareholders and option holders were paid $141,509,000. Fees paid professionals and advisors, including Lazard, totaled $18,806,000. An additional $5,352,000 was disbursed at the closing in payment of accrued interest and term loan amortization. Most of the cash for these payments came from three sources: a stock issuance of $55 million by HMD Holding; sale of $45 million of subordinated debentures by Healthco; and secured bank loans to Healthco of $50 million. I construe the complaint to allege payments were made by Healthco after the merger, rather than by HMD Acquisition before the merger, although the complaint is somewhat vague on this central point, particularly as to who paid shareholders the $55 million raised through issuance of stock.

Because essentially all these funds were paid to shareholders and for expenses related to the shareholder distributions, Healthco was left with huge new indebtedness but without the funds whose loan created the debt. It had only $6.8 million in cash and no available credit under the credit facilities provided by the bank group. Indeed, it was overdrawn on its credit facilities by $6.3 million. The net effect of the transaction was that Healthco was left insolvent and with reasonably small capital.

Hicks, Muse, the financing banks, Healthco's directors and Lazard all exchanged and reviewed financial analyses projecting the post-LBO profitability of Healthco. These projections were unreasonable and unrealistic. For example, despite a 1990 EBITDA of $21.8 million, projections were made, on a worst case scenario, that EBITDA would be $38.5 million in 1991, $51.9 million in 1992 and $61.4 million in 1993. Expenses were predicted to decrease drastically by $7.6 million in the first year, even though during the first five months of 1991 they had increased by about $5 million over a comparable period in 1990. All those who participated in the LBO knew, or should have known, that the transaction would leave Healthco insolvent and with unreasonably small capital.

The company's downward slide accelerated after the LBO. By May of 1992, Healthco was in default under several of its bank loan covenants, including covenants concerning profit and net worth. In early June of 1993 the banks terminated all credit. On June 9, 1993, Healthco filed a petition with this court requesting relief under chapter 11. It was forced to terminate operations when I declined to approve a proposed borrowing arrangement with a new lender which would have granted the lender security interests having priority over present bank debt. The case was a converted to chapter 7 on September 1, 1993.

## II. FRAUDULENT TRANSFER LAW (COUNT 3)

### A. *In General*

■ In Count 3, the Trustee seeks to recover as fraudulent the $15 per share payments made to all selling shareholders, including Gemini. It is well settled that fraudulent transfer law applies to a leveraged buyout.[5] Because the payments fall

---

5. *E.g., Moody v. Security Pac. Business Credit, Inc.,* 971 F.2d 1056, 1064 n. 10 (3d Cir.1992); *United States v. Tabor Court Realty Corp.,* 803 F.2d 1288, 1297 (3d Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); *Crowthers McCall Pattern, Inc. v. Lewis,* 129 B.R. 992 (S.D.N.Y.1991); *Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488 (N.D.Ill.1988); *Aluminum Mills Corp. v. Citicorp N.A., Inc. (In re*

*Aluminum Mills Corp.),* 132 B.R. 869, 885 (Bankr.N.D.Ill.1991); *Ferrari v. Barclays Business Credit, Inc. (In re Morse Tool, Inc.),* 108 B.R. 389 (Bankr.D.Mass.1989); *Vadnais Lumber Supply Inc. v. Byrne (In re Vadnais Lumber Supply Inc.),* 100 B.R. 127, 134–35 (Bankr.D.Mass. 1989); *Kaiser Steel Corp. v. Jacobs (In re Kaiser Steel Corp.),* 87 B.R. 154, 160–62 (Bankr.D.Colo. 1988); *In re Ohio Corrugating Co.,* 70 B.R. 920,

outside the one year prepetition period covered by section 548 of the Bankruptcy Code, the Trustee does not rely on that statute. His complaint is instead grounded on section 544(b) of the Code, which authorizes a trustee to avoid a transfer of property by the debtor "that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title...." [6]

The complaint relies upon the fraudulent transfer law of no particular state. The Trustee refers generally to "state law governing fraudulent transfers," presumably in the belief that identity of the governing law depends upon where the transfers are deemed to have taken place. The Uniform Fraudulent Conveyance Act ("UFCA") is in effect in about half the states, including Massachusetts and New York.[7] Also about half the states have enacted the Uniform Fraudulent Transfer Act ("UFTA").[8] The complaint alleges Healthco received no "fair consideration" or "reasonably equivalent value" for its payments to the selling stockholders, and that the payments left Healthco "insolvent" and with "unreasonably small capital". These are the requisites of a so-called "constructively" fraudulent transfer under either the UFCA or the UFTA.

## B. *Trustee's Standing*

■ Gemini contends the Trustee cannot bring the present action, dependent as it is on the rights of creditors under state law, unless the claim of at least one present creditor was in existence at the time of the LBO. Gemini misunderstands the law. True, the UFCA and UFTA require a creditor's claim to be in existence at the time of the transfer sought to be avoided if the creditor's basis for avoidance is lack of adequate consideration plus insolvency.[9] But future creditors have avoidance rights if a transaction without adequate consideration leaves the debtor with unreasonably small capital.[10] Moreover, the Trustee alleges he represents "at least one qualified, unsecured creditor holding an allowable unsecured claim which existed at the time of the LBO...." Under the liberal rule of notice pleading, that allegation is enough. The Trustee need not name the creditor. Nor is it necessary that the claim held by that creditor at the bankruptcy filing be identical to the one he held at the time of the LBO.[11] It is apparently conceded by Gemini that although the cause of action belongs only to a single creditor the Trustee may pursue it for the benefit of the entire bankruptcy estate.[12]

## C. *Specific Allegations*

■ The complaint goes far beyond allegations of the bare statutory elements of a fraudulent transfer. The shareholder payments complained of were distributions in termination of stock interests—liquidating dividends. By their very nature, they involved no consideration flowing to Healthco. Nor did Healthco derive any indirect benefit from the payments. Its merger with a newly-organized shell corporation obviously pro-

---

926 (Bankr.N.D.Ohio 1987); *In re Anderson Indus.,* 55 B.R. 922, 926 (Bankr.W.D.Mich.1985); *see also Mancuso v. Champion (In re Dondi Fin. Corp.),* 119 B.R. 106 (Bankr.N.D.Tex.1990) (fraudulent transfer action lies concerning dividends received by shareholder); 4 CHAPTER 11 THEORY AND PRACTICE: A GUIDE TO REORGANIZATION § 27.08 (James F. Queenan, et al., eds. 1994).

6. 11 U.S.C. § 544(b) (1988).

7. 7A U.L.A. 430 (1985); *see, e.g.,* MASS.GEN.L. ch. 109A (1985 & Supp.1995).

8. 7A U.L.A. 643 (1985).

9. *See, e.g.,* MASS.GEN.L. ch. 109A, § 4 (1985) (conveyance by insolvent debtor fraudulent "as to creditors"). The legislative decision to restrict avoidance rights to present creditors in this instance was perhaps made on the assumption that an insolvent debtor is unable to obtain further credit.

10. *See, e.g.,* MASS.GEN.L. ch. 109A, § 5 (1985) (conveyance leaving debtor with unreasonably small capital fraudulent "as to creditors and as to other persons who become creditors during the continuance of such business....")"

11. *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.),* 193 B.R. 451, 458–59 (Bankr. S.D.Ohio 1995); *Official Unsecured Creditors' Comm. v. Citicorp North America, Inc. (In re Aluminum Mills Corp.),* 132 B.R. 869 (Bankr. N.D.Ill.1991).

12. *See Moore v. Bay,* 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931).

duced no synergy or enhancement of operating efficiency.

 The complaint alleges insolvency, a statutorily defined term. It goes into detail to support its allegation of unreasonably small capital, which is not statutorily defined. It vividly describes unreasonable projections of future profits made by the LBO's participants. Whether a leveraged buyout leaves a company with unreasonably small capital typically depends upon the reasonableness of the parties' projections.[13] To be reasonable, the projections must leave some margin for error.[14] These did not. The complaint depicts a company weak from losses being burdened with large new loans whose proceeds went to its stockholders. The term "unreasonably small capital" denotes a condition of financial disability short of insolvency but which makes insolvency reasonably foreseeable.[15] Healthco's condition following the LBO certainly meets that description.

The UFCA also permits avoidance of a transfer "made ... with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future codebtors...."[16] The UFTA has similar language. The Trustee's allegations concerning fraudulent intent do not include this statutory language. He merely asserts that the payments to selling shareholders are avoidable "under 11 U.S.C. § 544(b) and state law governing intentional and constructive fraudulent transfers." The wording of

state law, either the UFCA or the UFTA, is well known. Nevertheless, the pleading lacks the required particularity. I will dismiss this aspect of the Trustee's fraudulent transfer claim, without prejudice to the Trustee amending the complaint within twenty days to include the wording contained in fraudulent transfer law of "actual intent to hinder, delay or defraud" creditors.[17]

### D. Section 546(e)

 Gemini relies upon section 546(e) of the Code, quoted in full below,[18] which prohibits a trustee from avoiding a "transfer" that is "a settlement payment ... made by or to a ... stockbroker, financial institution, or securities clearing agency...."[19] Section 546(e) is of no help to Gemini, for three reasons. First, the complaint contains no allegation of a transfer "by or to" any entity referred to in the statute. The only transfers alleged are from Healthco to Gemini and the other selling shareholders. Neither Healthco nor Gemini is a "stockbroker, financial institution, or securities clearing agency," as those terms are defined in the Code.[20]

 Secondly, and more basically, section 546(e) would not govern even if one or more of such entities acted as an intermediary in Healthco's payment to Gemini. By its own terms, section 546(e) applies only to a "transfer" made by or to one of the named entities. An avoided "transfer" is recoverable only from a "transferee."[21] If the initial transfer-

---

13. *Moody v. Security Pac. Business Credit, Inc.,* 971 F.2d 1056, 1073 (3d Cir.1992); *Ferrari v. Barclays Business Credit, Inc. (In re Morse Tool, Inc.),* 148 B.R. 97, 133 (Bankr.D.Mass.1992); *Murphy v. Meritor Sav. Bank (In re O'Day Corp.),* 126 B.R. 370, 404–07 (Bankr.D.Mass.1991).

14. *Moody,* 971 F.2d at 1073; *Ferrari,* 148 B.R. at 133 (Bankr.D.Mass.1992).

15. *Moody,* 971 F.2d at 1070; *Ferrari,* 148 B.R. at 132.

16. *See, e.g.,* Mass.Gen.L. ch. 109A, § 7 (1985).

17. The Trustee may of course waive this ground as an unnecessary distraction.

18. Section 546(e) provides:

 Notwithstanding sections 544, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a margin

payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1) of this title. 11 U.S.C. § 546(e) (1988 and Supp. V 1993).

19. *Id.*

20. 11 U.S.C. § 101(22), (48), (53A) (1988 and Supp. V 1993).

21. Section 550(a) and (b) provide as follows:

 (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred,

ee makes a second transfer, the property may be recovered from the later transferee only if the "transfer is avoided" with respect to the "initial transferee." [22]

■ Gemini's difficulty is that a stockbroker, financial institution or securities clearing agency acting as an intermediary in the payment is not a "transferee." And because it is not deemed to have received property in a transfer, it cannot be a transferor of property. Although the Code does not define "transferee," case law establishes the term does not include a party who acts only as a conduit in a transfer and acquires no beneficial interest in the property.[23] Thus a bank is protected in receiving a check which is endorsed to it but destined for its depositor's account.[24] Protection is also given a clearinghouse in receiving funds for a customer's account,[25] to a lawyer in receiving settlement funds which he places in an escrow account and disburses to his client,[26] and, of particular relevance here, to a stockbroker who receives and disburses customer funds pay-

able to a selling shareholder in a leveraged buyout.[27]

The courts reason that a party who exercises no control over the transferred property and claims no beneficial interest in it should not be held responsible for having received a fraudulent transfer.[28] This is consistent with the principle of agency law which protects an agent who receives property paid under mistake and later, in good faith, delivers the property to his principal.[29] The rationale for interpreting "transferee" restrictively is also similar to that of the earmarking doctrine in preference law, under which funds loaned to a debtor but earmarked for a particular creditor are not treated as property of the debtor transferred to the creditor.[30]

Gemini cites *Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.).*[31] The Tenth Circuit there held section 546(e) barred recovery of fraudulent transfers received by selling shareholders in a leveraged buyout. It did so on the ground the proceeds came through one or more of the enti-

---

or, if the court so orders, the value of such property, from—
 (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
 (2) any immediate or mediate transferee of such initial transferee.
(b) The trustee may not recover under section (a)(2) of this section from—
 (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
 (2) any immediate or mediate good faith transferee of such transferee.
11 U.S.C. § 550(a) & (b) (1988).

**22.** *Id.*

**23.** *E.g., Nordberg v. Societe Generale (In re Chase & Sanborn Corp.),* 848 F.2d 1196 (11th Cir.1988); *Bonded Fin. Servs., Inc. v. European Am. Bank,* 838 F.2d 890 (7th Cir.1988); *Kaiser Steel Resources, Inc. v. Jacobs (In re Kaiser Steel Corp.)* 110 B.R. 514 (D.Colo.1990), *aff'd on other grounds sub nom. Kaiser Steel Corp. v. Charles Schwab & Co., Inc.,* 913 F.2d 846 (10th Cir. 1990); *Metsch v. First Alabama Bank of Mobile (In re Colombian Coffee Co.),* 75 B.R. 177 (S.D.Fla.1987); *Jet Florida, Inc. v. Airlines Clearing House, Inc. (In re Jet Florida Sys., Inc.),* 69 B.R. 83 (Bankr.S.D.Fla.1987); *Salomon v. Nedlloyd, Inc. (In re Black & Geddes, Inc.),* 59 B.R. 873 (Bankr.S.D.N.Y.1986); *Gropper v. Unitrac,*

S.A. *(In re Fabric Buys of Jericho, Inc.),* 33 B.R. 334 (Bankr.S.D.N.Y.1983); *cf. Lowry v. Security Pac. Business Credit, Inc.,* 892 F.2d 26, 28 (4th Cir.1989).

**24.** *Nordberg;* 848 F.2d at 1202; *Bonded Fin. Servs.,* 838 F.2d at 893; *First Alabama Bank,* 75 B.R. at 179.

**25.** *Jet Florida,* 69 B.R. at 84.

**26.** *Fabric Buys of Jericho,* 33 B.R. at 337.

**27.** *Kaiser Steel Resources,* 110 B.R. at 520–21.

**28.** *E.g. Bonded Fin. Servs.,* 838 F.2d at 893.

**29.** *E.g., United States v. Cambridge Trust Co.,* 300 F.2d 76, 78 (1st Cir.1962); *Seligson v. New York Produce Exch.,* 394 F.Supp. 125, 135 (S.D.N.Y. 1975); RESTATEMENT (SECOND) OF AGENCY § 339 (1957).

**30.** *See, e.g., Buckley v. Jeld–Wen, Inc. (In re Interior Wood Prods. Co.),* 986 F.2d 228 (8th Cir.1993); *McLemore v. Third Nat'l Bank in Nashville (In re Montgomery),* 983 F.2d 1389 (6th Cir.1993); *Nordberg v. Sanchez (In re Chase & Sanborn Corp.),* 813 F.2d 1177 (11th Cir.1987).

**31.** 952 F.2d 1230 (10th Cir.1991); *cert. denied,* 505 U.S. 1213, 112 S.Ct. 3015, 120 L.Ed.2d 887 (1992).

ties mentioned in the statute. The court did not, however, focus on the predicate of section 546(e)—that the transfer be otherwise recoverable from such an entity through exercise of an avoiding power. Apparently the point was not argued. The contention of the estate representative was that section 546(e) governs only transfers *to* one of these entities.[32] The court logically responded that the statute speaks of a transfer "made by or to" such an entity.[33]

■ There is a further reason why section 546(e) has no relevance to the Trustee's fraudulent transfer claim against Gemini. Gemini's payment is not a "settlement payment" within the meaning of the statute. The statutory definition of that term, set forth below,[34] is as opaque as it is circular. Committee reports accompanying the bills on section 546(e) and its predecessor indicate Congress intended to protect ordinary course of business transfers related to the purchase or sale of securities.[35] Congress was particularly concerned that avoidance of such transfers would leave a securities clearing agency exposed on its guaranty of payment of the sales price and delivery of the securities.[36] The payment to Gemini was a one-time distribution in complete liquidation of its stock interest. These circumstances, particularly where there is no showing of a guaranty by a securities clearing agency, are not what Congress had in mind in enacting section 546(e). The term "settlement payment" should

therefore not be interpreted to include payment in settlement of this type of transaction. One writer has so advocated.[37]

As reminded by a court construing section 546(f) of the Code,[38] we can learn much about statutory construction from the legal giants of the past. Learned Hand observed: "[I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning."[39] And Holmes has said: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."[40] I therefore part company with the *Kaiser Steel* court on this point as well.

## III. FRAUDULENT TRANSFER LAW (COUNT 5)

■ In Count 5, the Trustee seeks to recover from Gemini another allegedly fraudulent transfer—the $2,184,620.55 Healthco paid Gemini on November 2, 1990 in reimbursement of Gemini's expenses pursuant to the parties' settlement agreement. The Trustee alleges Healthco received no benefit from the payment, that Gemini "knew, or should have known, that the LBO would

32. *Id.*

33. *Id.* at 1240–41.

34. With respect to securities, the term is defined as follows:

"settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.... 11 U.S.C. § 741(8) (1988).

35. H.R.REP. No. 595, 95th Cong., 1st Sess. 392 (1977) (statute "protects the ordinary course of business in the market"); H.R.REP. No. 420, 97th Cong., 2d Sess. 261 (1982) ("The commodities and securities markets operate through a complex system of accounts and guarantees. Because of the structure of the clearing systems in these industries and the potential volatile nature of the markets, certain protections are necessary

to prevent the insolvency of one commodity or security firm from leading to the insolvency of other firms and possibly threatening the collapse of the affected market.")

36. *Id.*

37. Neil M. Garfinkel, *No Way Out: Section 546(e) is No Escape for the Public Shareholder of a Failed LBO,* 1991 COLUM.BUS.L.REV. 51 (1991).

38. *See, Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Sav. & Loan Ass'n (In re Bevill, Bresler & Schulman Asset Management Corp.),* 878 F.2d 742, 750 (3d Cir.1989).

39. *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.1945), *aff'd* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

40. *Towne v. Eisner,* 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918).

984

leave Healthco insolvent and leave it inadequately capitalized" and that the payment is "avoidable by Healthco under 11 U.S.C. § 544(b) and state law governing intentional and constructive fraudulent transfers."

Nowhere does the Trustee allege that on November 2, 1990 Healthco was insolvent or possessed unreasonably small capital. Nor does he allege lack of consideration for the transfer. All allegations along this line are directed to the time of the LBO in May of 1991. Count 5 is therefore deficient as a cause of action for "constructive" fraud under fraudulent transfer law. Also, for the reasons given in Part II, the count is deficient in stating a claim of intentional fraud. I will dismiss Count 5 without prejudice to an amendment.

## IV. FIDUCIARY OBLIGATIONS OF CARE AND LOYALTY OF HEALTHCO'S DIRECTORS (COUNT 14)

Count 14 is directed against Goldberg and the other Healthco directors who voted to approve the LBO. The count incorporates all the allegations made elsewhere concerning insolvency, unreasonably small capital and the like. It alleges that the projections which the directors relied upon were wholly unreliable, that the directors knew or should have known of their unreliability, that in approving the LBO the directors "breached their duties to Healthco and HMD Acquisition and their successors, shareholders and creditors", and that "[t]his breach was a proximate cause of damage suffered by Healthco."

It is hornbook law that a corporate director owes the corporation fiduciary obligations of care and loyalty.[41] A director's liability for breach of his duty of care is normally subject to the so-called "business judgment" rule.[42] Although the rule has various formulations, case law of Delaware (the state of Healthco's incorporation) phrases it in terms of imposing liability upon directors only for grossly negligent conduct.[43] The rule has been justified by the belief that courts and juries are poorly equipped to pass on the wisdom of business decisions, a rationale which is inconsistent with negligence principles of tort law governing professional malpractice.[44]

The protection afforded a director by the business judgment rule disappears when the director has a personal interest in the transaction.[45] The director's duty of loyalty then comes into play and requires the director not to place his personal interests above those of the corporation. A director involved in a personal transaction with the corporation has the burden of proving the transaction was fair to the corporation.[46] As the controlling shareholder of Gemini, a large Healthco stockholder, Goldberg clearly had a personal interest in the LBO. In leaving Healthco insolvent and with unreasonably small capital, the LBO could hardly have been more unfair to Healthco.

The Trustee also states a cause of action against Goldberg for breach of Goldberg's obligation of care, unprotected by the business judgment rule due to Goldberg's personal interest. This cause of action is present as a result of the LBO leaving Healthco with unreasonably small capital, even if Healthco remained solvent. Unreasonably small capital in fraudulent transfer law is a financial condition which makes a company's subsequent failure reasonably

---

**41.** 3 WILLIAM M. FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS, §§ 838, 990 (perm. ed. rev. vol. 1994) (hereinafter "FLETCHER").

**42.** 3 FLETCHER, *supra* note 41, at 1036.

**43.** *E.g., Smith v. Van Gorkom,* 488 A.2d 858, 874–75 (Del.1985).

**44.** *E.g., Crouse–Hinds Co. v. InterNorth,* 634 F.2d 690, 702 (2d Cir.1980). *But see* Franklin A. Gervurtz, *The Business Judgment Rule: Meaning-less Verbiage or Misguided Notion?* 67 S.CAL. L.REV. 287 (1994) (criticizing rule's rationale).

**45.** *E.g., Geddes v. Anaconda Copper Mining Co.,* 254 U.S. 590, 599, 41 S.Ct. 209, 212, 65 L.Ed. 425 (1921); *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1279 (Del.1989); *Edelman v. Fruehauf Corp.,* 798 F.2d 882, 886 (6th Cir. 1986); *Treadway Cos. v. Care Corp.,* 638 F.2d 357, 382–83 (2d Cir.1980); 3 FLETCHER, *supra* note 41, at §§ 919, 1009.

**46.** *Id.*

"foreseeable." [47] Foreseeability is of course the basic concept embodied in a cause of action for negligence. Negligent conduct is conduct which creates an unreasonable risk of injury.[48] Such conduct is to be contrasted with intentionally tortious conduct, which is conduct from which injury is certain or substantially certain to ensue.[49] So the Trustee's causes of action for fraudulent transfer and breach of director's duty of care boil down to proving the same thing—that it was reasonably foreseeable the LBO would bring about the company's subsequent failure. The circumstances surrounding the LBO certainly made that failure reasonably foreseeable. Indeed, in view of the gravity of a company's failure, in approving the LBO Goldberg could be found to have been grossly negligent, the governing standard of liability under the business judgment rule.

In discharging their duty of care owed the corporation, directors normally need be concerned only with the interests of stockholders. What is good for stockholders is usually good for the corporation.[50] That was not the case with the LBO. Although the shareholders fared quite well, receiving a cash price at least equal to the stock's current market value, Healthco was left terminally ill. When a transaction brings a corporation to insolvency or the brink of insolvency, the rights of creditors become paramount.[51] In those circumstances, notwithstanding shareholder consent, the corporation may, through a creditor representative, recover damages from the derelict directors.[52]

Goldberg's various contentions are like a Jackson Pollock painting—a dab here and a dab there. Some are inconsistent with each other. All lack merit. Goldberg contends, first of all, that the Trustee lacks standing to bring a claim against a Healthco director for breach of fiduciary duty. Such a claim, Goldberg says, belongs either to Healthco's creditors or its stockholders. That is patently not so. Directors owe their fiduciary obligations to the corporation.[53] Upon the corporation's bankruptcy, a claim for breach of that obligation is a property interest of the debtor which passes to the bankruptcy estate.[54] The prime beneficiaries of the bankruptcy estate are its creditors; only if there is a surplus above all claims do its stockholders benefit in their capacity as owners of the debtor.[55] Thus the Trustee stands in the shoes of the corporation; he can bring any suit the corporation could have brought, including suits against directors and controlling shareholders for breach of fiduciary duty.[56] The injury alleged here is pri-

---

**47.** *E.g., Moody v. Security Pac. Business Credit, Inc.,* 971 F.2d 1056 (3d Cir.1992).

**48.** Restatement (Second) of Torts § 8A cmt. b. (1965).

**49.** *Id.*

**50.** This means, for example, that when a bidding war is going on for the corporation's shares, directors should do nothing to inhibit the bids. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173 (Del.1986).

**51.** *E.g., Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *McCandless v. Furlaud,* 296 U.S. 140, 56 S.Ct. 41, 80 L.Ed. 121 (1935); *Clarkson Co. Ltd. v. Shaheen,* 660 F.2d 506 (2d Cir.1981); *Automatic Canteen Co. of Am. v. Wharton,* 358 F.2d 587, 590 (2d Cir.1966); *Davis v. Woolf,* 147 F.2d 629 (4th Cir.1945); *In re Jersey Materials Co.,* 50 F.Supp. 428 (D.N.J. 1943); *New York Credit Men's Adjustment Bureau, Inc. v. Weiss,* 305 N.Y. 1, 110 N.E.2d 397 (1953); 3 Fletcher, *supra* note 41, at § 849.

**52.** *McCandless,* 296 U.S. 140, 56 S.Ct. 41; *see also Commodity Futures Trading Comm. v. Wein-*

*traub,* 471 U.S. 343, 353, 105 S.Ct. 1986, 1993, 85 L.Ed.2d 372 (1985) (creditors, as well as shareholders, deemed beneficiaries of directors' fiduciary obligations).

**53.** 3 Fletcher, *supra* note 41, at § 990.

**54.** 11 U.S.C. § 541(a)(1) (1988 and Supp. V 1993).

**55.** 11 U.S.C. § 726 (1988).

**56.** *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 118 (2d Cir.1991); *Regan v. Vinick & Young (In re Rare Coin Galleries of America, Inc.),* 862 F.2d 896, 901 (1st Cir.1988); *Koch Refining v. Farmers Union Cent. Exch.,* 831 F.2d 1339, 1348 (7th Cir.1987), *cert. denied* 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988); *Mixon v. Anderson (In re Ozark Restaurant Equip. Co., Inc.),* 816 F.2d 1222, 1225 (8th Cir.1987), *cert. denied* 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987); *Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 508 (N.D.Ill.1988); *Henderson v. Buchanan (In re Western World Funding, Inc.),* 52 B.R. 743, 775 (Bankr.D.Nev.

marily to Healthco; it is an injury to Healthco's creditors only in that it decreases assets available to them for satisfaction of their debts.[57]

■ Goldberg also contends a trustee in bankruptcy cannot enforce a claim belonging to a creditor. That is the holding of *Caplin v. Marine Midland Grace Trust Co. of New York*.[58] But, again, the Trustee is not enforcing any claim belonging to a creditor.

■ Goldberg argues the Trustee cannot pursue breach of fiduciary duty claims when, as here, the corporation's stock is owned by persons who were not stockholders at the time of the challenged conduct, citing *Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Co*.[59] The doctrine of *Bangor Punta* has no relevance. The Court there dismissed a corporation's claim for breach of fiduciary duty because its principal stockholder acquired its stock interest after the conduct complained of, so that recovery on the claim would be a windfall to the stockholder. That is not our case. Healthco's creditors will be the beneficiaries of the claims in Count 14. The *Bangor Punta* doctrine applies only to prevent Hicks, Muse and the other post-LBO stockholders from benefitting.

## V. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (COUNT 13)

■ The Trustee alleges in Count 13 that Lazard, among others, provided "substantial assistance" in consummation of the LBO, that Lazard knew or should have known the LBO would leave Healthco insolvent and with unreasonably small capital, and that Lazard realized Healthco's directors, in approving the LBO, were breaching their fiduciary obligations.

■ Lazard says there is no cause of action for aiding and abetting a fraudulent transfer, only a cause of action under fraudulent transfer law against a transferee. Strictly speaking, that is so. But the complaint asserts Healthco's directors breached their fiduciary obligations and that Lazard in its capacity as financial advisor to the company cooperated in the breach. A party who knowingly participates in a breach of fiduciary duty is liable to the beneficiary of the duty.[60]

## VI. FIDUCIARY OBLIGATIONS OF CONTROLLING SHAREHOLDERS (COUNTS 15 AND 16)

■ The Trustee alleges in Count 16 that certain shareholders, including Gemini, were "controlling shareholders" of Healthco, that as such they owed Healthco a fiduciary duty, and that they breached this obligation in causing Healthco to enter into a transaction which they knew or should have known would render it insolvent and leave it with unreasonably small capital. I construe the allegation that Gemini was a "controlling" shareholder to mean that Gemini, despite its minority interest, actually exercised direction over Healthco's conduct. Count 15 is similar. It alleges that Goldberg, through his control of Gemini, was a shareholder who exercised control over Healthco in his capacity as a director of Healthco. As a director participating in the approval of the LBO, Goldberg obviously exercised control over Healthco.

■ A controlling shareholder has a fiduciary obligation to see that a sale is fair

1985), *aff'd in part and reversed in part on other grounds sub nom., Buchanan v. Henderson*, 131 B.R. 859 (D.Nev.1990), *rev'd on other grounds*, 985 F.2d 1021 (9th Cir.1993).

57. *Western World Funding*, 52 B.R. at 775.

58. 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) (trustee unable to pursue claims of debenture holders against debenture trustee).

59. 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974).

60. *E.g., Q.E.R., Inc. v. Hickerson*, 880 F.2d 1178, 1182–83 (10th Cir.1989) (recognizing cause of action for aiding and abetting breach of fiduciary duty by partner); *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 848 (2d Cir.1987); *AmeriFirst Bank v. Bomar*, 757 F.Supp. 1365, 1380 (S.D.Fla. 1991); *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 999 (S.D.N.Y.1991); *Aluminum Mills Corp. v. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 892 (Bankr. N.D.Ill.1991); *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1284 n. 33 (Del.1989); *Laventhol, Krekstein, Horwath & Horwath v. Tuckman*, 372 A.2d 168, 170 (Del.1976).

to the corporation and its noncontrolling shareholders.[61] He is liable to the corporation when he sells his stock to a party who damages the corporation by using its assets for his own benefit if the controlling shareholder should have known this would happen from the circumstances surrounding the sale.[62] This doctrine has been applied to a leveraged buyout.[63]

Gemini and Goldberg were fully aware of the details of the LBO. They knowingly cooperated in the defaults of Healthco's directors.

## VII. LAZARD'S BREACH OF ITS FINANCIAL ADVISOR'S CONTRACT (COUNT 18)

In Count 18, the Trustee seeks to hold Lazard accountable for deficient performance under its financial advisor's agreement with Healthco. Lazard mounts several arguments in support of its motion to dismiss this count.

Lazard contends the Trustee is attempting to hold it responsible for failure to conduct its own audit of Healthco's books, an activity obviously falling outside its contractual duties under the contract. Lazard misstates the Trustee's complaint. The Trustee alleges, based on the information Lazard knew or should have known from available financial statements, that Lazard was derelict in its contractual obligations when it failed to advise Healthco against effecting the transaction and, indeed, encouraged it.

■ Nor is there any merit to Lazard's argument that its obligations were confined to issuance of a fairness opinion and finding a buyer. Lazard's agreement of engagement does not even mention a fairness option. And it provides in broad terms that Lazard was to act as Healthco's "exclusive financial advisor." Lazard agreed, among other things, to "consider the appropriateness of various financial and acquisition alternatives" and "to evaluate any transaction. . . ." Lazard acknowledged its familiarity with the company's financial condition and stated this would enable it "to approach various situations not simply on a transactional basis but rather from a long-term perspective." The complaint alleges Lazard "played a substantial role in negotiating and formulating the LBO" and that it knew, or should have known, the transaction would leave Healthco insolvent and with unreasonably small capital. Lazard's compensation was largely based upon the total consideration payable in the LBO. Lazard cannot limit its LBO-related activities and obligations to the issuance of a rather innocuous fairness opinion.

■ Lazard finds comfort in a contract clause in which Healthco agreed Lazard would have no liability to it except for a loss to Healthco "which [is] finally judicially determined to have resulted primarily from [Lazard's] bad faith or gross negligence." The Trustee cites decisions in which bankruptcy courts refused to approve the employment of investment advisors under such terms.[64] The courts did so because they believed such clauses are unseemly in the employment of professionals acting in a fiduciary capacity.[65] I agree. It is tacky, to say the least, for a professional to hide behind such a clause. But I am not being asked to approve Healthco's execution of this agreement. Its board of directors did that. The question before me is the enforceability of this clause.

The Trustee cites a New Jersey decision voiding a clause in an investment management agreement with a bank exempting the bank from liability for any action taken in

---

**61.** *Clagett v. Hutchison,* 583 F.2d 1259 (4th Cir. 1978); *Swinney v. Keebler Co.,* 480 F.2d 573 (4th Cir.1973); *United States v. Gleneagles Inv. Co.,* 565 F.Supp. 556 (M.D.Pa.1983), *modified in part on other grounds sub nom. United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); *Insuranshares Corp. v. Northern Fiscal Corp.,* 35 F.Supp. 22, 25 (E.D.Pa. 1940); 12B FLETCHER, *supra* note 41, at § 5805.

**62.** *Id.*

**63.** *See Gleneagles Inv. Co.,* 565 F.Supp. 556.

**64.** *See, e.g., In re Gillett Holdings, Inc.,* 137 B.R. 452 (Bankr.D.Colo.1991); *In re Mortgage & Realty Trust,* 123 B.R. 626 (Bankr.C.D.Cal.1991); *In re Allegheny Int'l, Inc.,* 100 B.R. 244 (Bankr. W.D.Pa.1989).

**65.** *Id.*

good faith.[66] · Lazard's agreement, however, states it "shall be governed by and construed in accordance with the law of Delaware...." The Trustee offers no reason why that choice of law should not be given effect.

 Under the law of Delaware, a contract clause exempting a party from liability for negligence is enforceable.[67] Although Delaware courts recognize that such protection is not favored in the law, they uphold it if the parties' intent is clear.[68] Thus Lazard is responsible only for conduct amounting to gross negligence or bad faith. For the reasons discussed in connection with Goldberg's liability as a director, however, Lazard's conduct could be found to be grossly negligent.

 Lazard's final ground for its motion to dismiss is a clause in its contract which selects Delaware both as the forum for contractual disputes and the source of controlling law.[69] The clause reads as follows:

> 10. This agreement and any claim related directly or indirectly to the agreement (including any claim concerning advice provided pursuant to this agreement) shall be governed by and construed in accordance with the laws of Delaware (without giving regard to the Delaware conflict of laws provisions). No such claim shall be commenced, prosecuted or continued in any court other than the Chancery Court in and for New Castle County, Delaware, which shall be the exclusive and only proper forum for adjudicating such a claim.

 Under the controlling law, that of Delaware, a forum selection clause is enforceable if the clause "is not unreasonable at the time of litigation."[70] Delaware law on this point is essentially the same as federal law.[71] In *The Bremen v. Zapata Off–Shore Co.*,[72] the Supreme Court held a forum selection clause is enforceable unless it is shown "that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching."[73]

The Trustee makes no contention the clause is the product of fraud or overreaching. Nor does the Trustee argue litigation in Delaware would be unreasonable or unjust for geographical reasons. His concern with Delaware as a forum is even more basic. Commencement of suit in Delaware is barred by the Delaware statute of limitations. This cause of action occurred, at the latest, on May 22, 1991, when the LBO closed. The applicable Delaware statute of limitations[74] is three years, so that under Delaware law suit had to be commenced by May 21, 1994. That period is extended by section 108(a) of the Bankruptcy Code, which permits suit before the later of expiration of the limitations period under applicable non-bankruptcy law or two years after the order for relief.[75] The order of relief having been entered on June 9, 1993, the Trustee was therefore required to commence this suit no later than June 8, 1995. He did so on June 8, 1995, one day before the two year period expired.

**66.** *See Erlich v. First Nat'l Bank of Princeton*, 208 N.J.Super. 264, 505 A.2d 220 (1984).

**67.** *E.g., Downey v. Sanders*, 1996 WL 190755, at *2 (Del.Super.Ct. March 22, 1996); *James v. Getty Oil Co. (Eastern Operations)*, 472 A.2d 33, 36 (Del.Super.Ct.1983); *Powell v. Interstate Vendaway, Inc.*, 300 A.2d 241, 243 (Del.Super.Ct.1972); *see* 17A AM.JUR.2D *Contracts* § 297 (1991).

**68.** *Id.*

**69.** In this Circuit, dismissal of a complaint based on a forum selection clause is properly accomplished by motion under Rule 12(b)(6) for failure to state a claim, not by motion under Rule 12(b)(3) for improper venue. *Lambert v. Kysar*, 983 F.2d 1110, 1112 n. 1 (1st Cir.1993); *LFC Lessors, Inc. v. Pacific Sewer Maintenance Corp.*, 739 F.2d 4, 7 (1st Cir.1984). *Contra Stewart*

*Org., Inc. v. Ricoh Corp.*, 810 F.2d 1066 (11th Cir.1987), *aff'd on other grounds*, 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988).

**70.** *Elia Corp. v. Paul N. Howard Co.*, 391 A.2d 214, 216 (Del.Super.Ct.1978).

**71.** *Id.*

**72.** 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972).

**73.** 407 U.S. at 15, 92 S.Ct. at 1916. *Accord Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991).

**74.** 10 DEL.CODE ANN. tit. 10, § 8106 (1995).

**75.** 11 U.S.C. § 108(a) (1988).

A new suit in Delaware is accordingly time-barred. Primarily because of this, I conclude it would be unjust to enforce the forum selection clause. Courts enforcing forum selection clauses often do so with the observation that the objecting party is not deprived of a forum in which to litigate.[76] This obviously is not the case here. As recently observed by the Supreme Judicial Court of Massachusetts, a statute of limitations bar is a proper consideration for a court to take into account in denying enforceability of a forum selection clause.[77] I find no countervailing considerations. To the contrary, even if the limitations period had not expired, trial in Delaware would have serious drawbacks. It would involve a tremendous duplication of time and effort on the part of the Trustee. As detailed in this opinion, the Trustee's claims against Lazard are inextricably linked to his claims against others under fraudulent transfer law and principles of fiduciary obligation. At the heart of all the claims is the Trustee's assertion that the LBO left Healthco insolvent or with unreasonably small capital. If the case against Lazard is split off from this litigation, the Trustee would have to prove that twice. And two trials could bring about results which are essentially inconsistent. For example, Healthco's directors could be found liable for breach of fiduciary duty and Lazard could be exonerated from knowing cooperation in such a breach on the ground no breach occurred.

Lazard contends dismissal is not unjust. To let the case remain here, says Lazard, permits the Trustee to avoid the clause by the stratagem of waiting to bring suit in a forum of his choice until after the Delaware statute of limitations period has expired. But there is no indication the Trustee adopted this stratagem. The Trustee's delay in bringing suit appears to be the result of the complexity of this case. The Delaware three year limitations period expired about a year before the Trustee brought suit. In the case relied upon by Lazard,[78] the court merely noted the possibility of such a stratagem. And it was not clear there that the case was time-barred in the forum designated by contract.

## VIII. UNJUST ENRICHMENT OF SELLING SHAREHOLDERS (COUNT 20)

The Trustee alleges in Count 20 that the LBO unjustly enriched Gemini and the other selling shareholders. The equitable cause of action for unjust enrichment requires: (i) receipt of a benefit, (ii) resulting detriment to the other party, and (iii) circumstances which make retaining the benefit unjust.[79] Healthco's distribution to Gemini meets this standard. The enrichment of Gemini is unjust in that it was brought about through breach of its fiduciary obligation as a controlling shareholder and breach of Goldberg's obligations as a director. There is jurisdiction in equity to prevent unjust enrichment arising out of a breach of fiduciary obligations.[80]

Gemini says the Trustee's proper remedy is under fraudulent transfer law. But fraudulent transfer law might not apply to the entire stockholder distribution. HMD Acquisition received $55 million in proceeds from the stock issuance made by HMD Holding. HMD Acquisitions may have paid these funds to the selling shareholders prior to its merger with Healthco. If it did, the payment would not be a transfer by Healthco and thus not covered by fraudulent transfer law or corporate statutes restricting distributions to shareholders.[81] This was the basis

**76.** See, e.g., R.W. Granger & Sons, Inc. v. Rojac Co., Inc., 885 F.Supp. 319, 322 (D.Mass.1995).

**77.** See Jacobson v. Mailboxes Etc. U.S.A., 419 Mass. 572, 646 N.E.2d 741, 746 (1995).

**78.** General Elec. Co. v. Siempelkamp, 809 F.Supp. 1306, 1314 (S.D.Ohio 1993), aff'd, 29 F.3d 1095 (6th Cir.1994).

**79.** E.g., Chrysler Corp. v. Airtemp Corp., 426 A.2d 845, 855 (Del.Super.1980).

**80.** Branch v. FDIC, 825 F.Supp. 384, 411–12 (D.Mass.1993); Barche v. Shea, 335 Mass. 367, 140 N.E.2d 305 (1957); Barry v. Covich, 332 Mass. 338, 124 N.E.2d 921 (1955); Warsofsky v. Sherman, 326 Mass. 290, 93 N.E.2d 612 (1950).

**81.** See, e.g., C–T of Virginia, Inc. v. Barrett (In re C–T of Virginia, Inc.), 958 F.2d 606, 612 (4th Cir.1992) (funds paid directly by buyer to selling shareholders not corporate distributions).

for my previous dismissal of the counts on fraudulent transfer and excessive shareholder distributions as to some selling shareholders; they established they received their payments from HMD Acquisitions.

Gemini complains the Trustee has not pleaded that his remedy at law is inadequate. The Trustee says this is not necessary because the complaint seeks relief against the selling shareholders under three alternative theories—fraudulent transfer law, corporate law regulating shareholder distributions and principles of unjust enrichment. The Trustee may, however, plead inconsistent causes of action.[82] The Trustee's failure to plead inadequacy of legal remedies is understandable and perhaps at most a technical defect. But I will require the complaint to be amended to cure it.

## IX. EXCESSIVE SHAREHOLDER DISTRIBUTIONS UNDER CORPORATE LAW (COUNT 21)

The Trustee alleges in Count 21 that Healthco's payments to the selling shareholders constituted excessive distributions "under applicable state statutory law." The presence of a corporate statute restricting shareholder distribution does not prevent application of fraudulent transfer law.[83] Healthco was incorporated under Delaware law, so the law of that state controls this cause of action.[84]

Not surprisingly, Delaware is quite permissive in its regulation of shareholder distributions. A Delaware corporation may make a distribution to shareholders so long as the amount of the distribution does not exceed its surplus and current profits.[85] The Delaware statute contains no requirement that the distribution leave the corporation solvent.[86] It may be that prior to the LBO Healthco's surplus was increased by appraisal, with a corresponding reduction in capital. Delaware requires that a reduction in capital

leave the corporation with sufficient assets to pay debts.[87] The complaint contains no allegation that Healthco's distribution to its shareholders exceeded surplus or that there was a reduction in capital which left Healthco insolvent. I will therefore dismiss Count 21 without prejudice to amendment within twenty days.

A separate order has issued in accordance with this opinion.

---

**82.** FED.R.BANKR.P. 7008; *see Michael v. Clark Equip. Co.*, 380 F.2d 351 (2d Cir.1967).

**83.** 4 CHAPTER 11 THEORY AND PRACTICE: A GUIDE TO REORGANIZATION § 27.24 (James F. Queenan, et al., eds. 1994).

**84.** 18 AM.JUR.2D *Corporations* §§ 17, 26 (1985).

**85.** DEL.CODE ANN. tit. 8, § 170 (1974 & Supp. 1986).

**86.** *Id.*

**87.** DEL.CODE ANN. tit. 8, § 244(b) (1974 & Supp. 1986).