**HECHINGER INVESTMENT COMPANY OF DELAWARE,**
Debtor.

Official Committee of Unsecured Creditors of Hechinger Investment Company of Delaware Inc., on behalf of Hechinger Investment Company of Delaware Inc., Plaintiff,

v.

Fleet Retail Finance Group, Chase, the Chase Manhattan Bank, and Back Bay Capital Funding, LLC, each individually and as agents for various banks party to credit agreements, John W. Hechinger, Leonard Green & Partners, L.P., Green Equity Investors II, L.P., John W. Hechinger, Jr., S. Ross Hechinger, Ann D. Jordan, Robert S. Parker, Melvin A. Wilmore, Alan J. Zakon, Kenneth J. Cort, W. Clark McClelland, June R. Hechinger, Nancy Hechinger Lowe, Sally Hechinger Rudoy, Catherine S. England, Richard England, Jr., June L.P., Lois Associates L.P., and Jarsan Associates L.P., Defendants.

Bankruptcy Nos. 99–2261 to 99–2283.
Civ.A. No. 00–840–RRM.

United States District Court,
D. Delaware.

Feb. 20, 2002.

Mark Minuti, Saul Ewing LLP, Wilmington, DE, David M. Frieman, David E. Ross, Andrew K. Glenn, Marvin C. Peguese, Kasowitz, Benson, Torres & Friedman LLP, New York City, for The Official Committee of Unsecured Creditors.

Kenneth J. Nachbar, James G. McMillan, III, Morris, Nichols, Arsht, & Tunnell, Wilmington, DE, Mitchell A. Karlan, Gibson, Dunn & Crutcher, New York City, for defendants John W. Hechinger Jr., S. Ross Hechinger, Ann D. Jordan, Robert S. Parker, Melvin A. Wilmore, Alan J. Zakon, Kenneth J. Cort, W. Clark McClelland, June R. Hechinger, Nancy Hechinger Lowe, Sally Hechinger Rudoy, June L.P., Jarsan Associates LP, and John W. Hechinger.

Martin S. Lessner, Brendan Shannon, Young, Conaway, Stargatt & Taylor LLP, Wilmington, DE, Lawrence S. Robbins, Arnon D. Siegel, Kathryn S. Zecca, Robbins, Russell, Englert, Orseck & Untereiner LLP, Washington, D.C., Phillip D. Anker, Joshua R. Stebbins, Wilmer, Cutler, & Pickering, Washington, D.C., for Catherine S. England, Richard England, Jr., and Lois Associates, L.P.

## MEMORANDUM OPINION

McKELVIE, District Judge.

This is a bankruptcy adversary proceeding raising claims for fraudulent conveyance, breach of fiduciary duty, unjust enrichment, and equitable subordination. All the claims arise from a series of transactions that culminated in the leveraged buyout ("LBO") of the Debtor, Hechinger Company. The suit is brought by the Official Committee of Unsecured Creditors of Hechinger Investment Company of Delaware and its affiliated debtors [1] (collectively, the "Committee") against certain former directors and controlling shareholders of Hechinger and certain lenders and investors who financed the Hechinger LBO.

The defendants fall into four groups. Defendants John W. Hechinger, John W. Hechinger, Jr., S. Ross Hechinger, Ann D. Jordan, Robert S. Parker, Melvin A. Whitmore, Alan J. Zakon, Kenneth J. Cort, W. Clark McClelland, June R. Hechinger,

---

1. According to the amended complaint, this action is brought on behalf of the estates of Hechinger Company, Hechinger Investment Company of Delaware, Inc., Hechinger Stores Company, Hechinger East Coast Stores Company, Centers Holdings, Inc., BSQ Acquisition, Inc., BSQ Transferee, Inc., BucksProp Holding Company, HProp, Inc., HQ Southwest, Inc., HQ Partners, HQ Mid–Atlantic, LLC, Hechinger Finance, Inc., Hechinger Financial Holdings Company, Hechinger International, Inc., Hechinger Property Company, Hechinger Royalty Company, Hechinger Towers Company, HIDS, Inc., ManProp Holding Company, Pennsy, Inc., PhilProp Holding Company, and RemProp, Inc. (collectively, "the Debtors").

Nancy Hechinger Lowe, and Sally Hechinger Rudoy (collectively, the "Hechinger Defendants") formerly were directors and, in some cases, officers of Hechinger. Defendants Catherine S. England, Richard England, Jr., and Lois Associates L.P. (collectively, the "England Family Defendants") were shareholders of the Hechinger Company whose shares were part of the controlling block of shares that voted in favor of the transaction. Defendants Fleet Retail Finance Group, Chase Manhattan Bank, and Back Bay Capital Funding (collectively, the "Bank defendants") were lenders that financed the transaction. Last, defendants Leonard Green & Partners, L.P. and Green Equity Investors II, L.P. ("GEI II") are the companies that ultimately acquired Hechinger in the transaction.

The Committee's claims in this case arise out of a two-step transaction consisting of the acquisition of Builders Square, Inc. ("the Builders Square acquisition"), followed by the leveraged buy-out of Hechinger ("the Hechinger LBO").[2] This transaction, according to the Committee, was an unmitigated failure that "sealed the Debtors' financial doom" by leading to the subsequent Chapter 11 bankruptcy, business failure, and ultimate liquidation of Hechinger. The Committee alleges that through the LBO transaction "the Defendants facilitated the transfer of enormous value from the Debtors to

themselves for no consideration and shifted *all* of the risk of the Debtors' operations to their unsecured creditors" by cashing out their equity interests in Hechinger while incurring on behalf of Hechinger hundreds of millions of unserviceable secured debt, at a time when the company was insolvent. The Committee further alleges that the defendants who are former directors, officers, and controlling shareholders of Hechinger "breached their respective fiduciary duties by engineering, facilitating, recommending, and approving [the] misconceived leveraged buy-out . . . ."

Based on these allegations, the Committee, by its amended complaint, brings claims against the defendants (i) to recover as fraudulent conveyances, under section 544(b) of the Bankruptcy Code,[3] payments made to the defendants as shareholders pursuant to the Hechinger LBO (Counts VI and VII) and payments made to the acquirers of Hechinger and the Bank defendants pursuant to the Hechinger LBO (Counts VIII, IX, X, XI, and XII), (ii) to redress breaches of fiduciary duties to Hechinger and its creditors by the Hechinger Defendants and the England Family Defendants for approving the Hechinger LBO while Hechinger was insolvent (Counts I and II) and to redress the aiding and abetting of those breaches of fiduciary duty by the acquirers of Hechinger

---

**2.** The amended complaint refers to this set of transactions as "the Transaction." The court acknowledges that the parties dispute whether the series of transactions that encompassed the acquisition and the leveraged buyout can be considered one transaction for the purpose of assessing duties. The court will address this dispute, *infra*, in section II.C.2. However, for simplicity, court will refer to the Builders Square acquisition and Hechinger LBO transactions throughout this opinion in the manner that they are alleged, as a single integrated transaction.

**3.** Section 544(b) provides, in relevant part, that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." 11 U.S.C. § 544(b)(1). Section 544(b) is distinct from section 548(a)(1), which covers fraudulent transfers made *within one year* before the date of the filing of the bankruptcy petition. See 11 U.S.C. § 548(a)(1).

(Counts IV and V), (iii) to redress unjust enrichment by the defendants as shareholders, for allegedly stripping Hechinger of the proceeds of the Hechinger LBO (Count III), and (iv) to equitably subordinate the Bank defendants' secured claims to those of all other creditors in the Debtors' bankruptcy proceedings (Count XIII).

Certain groups of defendants have moved to dismiss the amended complaint as to them. On July 16, 2001, the Hechinger Defendants moved to dismiss the amended complaint as to the three claims brought against them: breach of fiduciary duty (Counts I and II), fraudulent conveyance (Counts VI and VII), and unjust enrichment (Count III). The next day, the England Family Defendants moved to dismiss the same three claims, which were also brought against them.

With respect to the Committee's fraudulent conveyance and unjust enrichment claims, the briefs in support of both motions rely on identical arguments. Both sets of defendants argue the fraudulent conveyance claim is barred by the "settlement payment" exception codified in section 546(a) of the Bankruptcy Code. *See* 11 U.S.C. § 546(a). They also argue the unjust enrichment claim should be dismissed because the Committee lacks standing, the claim is preempted by section 546(a) of the Bankruptcy Code, or the Committee has failed to allege all of the required elements of the claim.

The two sets of defendants rely on different arguments in support of their motions to dismiss the Committee's breach of fiduciary duty claims. The Hechinger Defendants contend the "Hechinger LBO" at issue was not one transaction, but was a series of separate transactions, and that because, by virtue of the earlier transactions, they were no longer directors or officers at the time of the leveraged buy-

out portion of the transaction, they did not at that time owe or breach a fiduciary duty to the creditors of Hechinger. The England Family Defendants argue they could not have breached any fiduciary duty to the creditors of Hechinger because at the time of the Hechinger LBO their shares were held in a voting trust over which they had no control. The England Family Defendants submit that because they had no voting power at the time of the Hechinger LBO, they cannot be held liable for the votes cast approving the Hechinger LBO.

On January 3, 2002, the court heard oral argument on the two motions to dismiss. This is the courts decision on the two motions.

## I. *BACKGROUND*

The court draws the following facts from the allegations of the amended complaint and the documents annexed thereto. For the purposes of these motions to dismiss, the court accepts these facts as true.

### A. *Hechinger: Background and Corporate Structure*

Prior to September 1997, Hechinger, which owned and operated stores under the Hechinger's and Home Quarters trademarks, was a major retailer of products and services for home improvement, modeling, and maintenance. Hechinger was the parent company of several corporations that ran these retail chains.

Hechinger was founded by Sidney Hechinger in 1911. Although the company become public in 1972, members of the Hechinger family—including John W. Hechinger, Jr., John W. Hechinger, S. Ross Hechinger and other Hechinger and England Family Defendants—retained control over the company until the Hechinger LBO. As of 1997, Hechinger had two classes of stock, class A (31 million shares

outstanding) and class B (11.2 million shares outstanding). Because the Hechinger and England Family Defendants owned most of the class B shares, which allowed them to cast ten votes for each share held, they controlled over 70% of the voting power of Hechinger even though they did not own a majority of Hechinger's stock.

## B. Events Leading up to the Hechinger LBO

### 1. Hechinger's Financial Decline

From 1983 to 1996, Hechinger embarked on a major expansion program in which it added eighty-four stores to its already existing base of thirty-four stores. By 1995, however, intense competition led by industry giants Home Depot and Lowe's forced Hechinger to close sixteen of its Home Quarters Stores and nine Hechinger's stores. Beginning in 1994, Hechinger's operating performance went into a precipitous and sustained decline, marked by decreased sales and increasing losses, culminating in a loss of $206 million during the period from February 4, 1997 to September 27, 1997, when the Hechinger LBO was consummated.

According to the amended complaint, as of September 1997, Hechinger was already highly leveraged and insolvent. At that time, it had approximately $321 million outstanding on three public bond issues along with a revolving credit facility of approximately $110 million with CIT Group/Business Credit, Inc. Hechinger's debt service coverage—earnings before interest, taxes, depreciation, and amortization ("EBITDA") minus capital expenditures divided by interest—for the twelve months ending August 2, 1997 was 0.9, which, according to the complaint, meant that its cash flow was insufficient to meet its interest obligations. During that same period, Hechinger's debt was 11.5 times EBITDA.

### 2. The Acquisition of Hechinger and Builders Square

In the face of these heavy losses and mounting competition from large competitors in the industry, the Hechinger and England Family Defendants sought to cash themselves out. Consequently, in mid–1996 Hechinger retained the investment firm Donaldson, Lufkin & Jenrette ("DLJ") to find a buyer for its business. DLJ prepared an Information Memorandum for potential bidders, but the offering did not attract any significant interest until early 1997.

Builders Square, Inc. was another company that ultimately was involved in the challenged set of transactions. Prior to September 1997, Builders Square, the third largest retailer of home improvement and home decor products and services in the United States, was wholly owned by Kmart Corporation. Builders Square's operations were, like Hechinger's, also highly leveraged and capital intensive. Builders Square's performance suffered because of the same intense industry competition confronting Hechinger. As a result, the deteriorating operating performance and financial condition of Builders Square was similar to that experienced by Hechinger.

Builders Square, like Hechinger, also began to experience serious financial trouble at least as early as 1994 with losses increasing in each succeeding year. By January 1997, Builders Square had amassed an inter-company loan from Kmart of over $1 billion. In early 1996, Kmart reclassified Builders Square as a discontinued operation. At that time, Kmart also hired DLJ as its financial advisor to market Builders Square to any potential acquirers.

In the summer of 1997, defendant Leonard Green & Partners, a company specializing in leveraged buyouts, emerged as the only bidder with serious interest in acquiring Hechinger and Builders Square. Although Leonard Green originally had considered Hechinger and Builders Square as alternative transactions, eventually it decided to acquire Builders Square and merge it with Hechinger under the framework of the leveraged buyout of Hechinger. The deal originally provided that Leonard Green would pay $4 per share for all of the class B shares and $2.25 per share to acquire 8% of the class A shares.

Hechinger's poor financial performance continued through the summer of 1997, leaving Hechinger with no choice but to renegotiate a significantly lower purchase price with Leonard Green. Ultimately, Leonard Green agreed to pay all of the Hechinger shareholders $2.375 per share.

In advance of consummating the sale transaction with Leonard Green, Hechinger requested that DLJ render an opinion to the board of directors that the Hechinger LBO was fair to shareholders from a financial point of view. DLJ gave the board the fairness opinion that it sought. It is alleged, however, that DLJ's analysis demonstrated that Hechinger was insolvent using recognized valuation methodologies for determining solvency such as "comparable acquisition analysis" and "discounted cash flow analysis." A liquidation analysis prepared by Hechinger also indicated substantial insolvency. Nonetheless, Hechinger proceeded with the Hechinger LBO and Builders Square Acquisition. The transaction was approved by all defendants through a vote of the board of directors and a vote of the controlling shareholders.

### 3. The Hechinger LBO and Builders Square Acquisition

The Builders Square acquisition and the Hechinger LBO were effected in an integrated transaction consisting of a series of complex steps—including the formation of new corporations and several inter-company transfers. The various steps occurred over several days culminating on September 27, 1997. During this period, Hechinger acquired Builders Square, and Hechinger received a series of temporary loans that were repaid through a permanent $600 million secured credit facility, the proceeds of which were used to cash out the shareholders of Hechinger and to pay, among other things, tens of millions of dollars in transaction fees.

### a. The Builders Square Acquisition

The first step of the Hechinger LBO was Hechinger's acquisition of Builders Square. On July 17, 1997, a Purchase and Sale Agreement was executed among BSQ Acquisition, Inc., Kmart, and Builders Square. Pursuant to the Purchase and Sale Agreement, Builders Square formed BSQ Transferee Corp. ("BSQT"), which acquired most of the operating assets and certain liabilities of Builders Square from Kmart in exchange for the stock of BSQT and a promissory note in the amount of $10.7 million.

Defendant GEI II then formed Centers Holdings, Inc. with a capital contribution of $25 million. Centers Holding then transferred the $25 million capital contribution (less certain costs and expenses) to BSQ Acquisition, a newly formed subsidiary of Centers Holdings. Defendants Leonard Green & Partners or GEI II allegedly received $10.5 million for certain fees relating to this transaction.

On September 25, 1997, BSQ Acquisition purchased the stock of BSQT from Builders Square for $10 million in cash plus a warrant to purchase 30% of the stock of Centers Holdings. As of that date, Coopers and Lybrand estimated that the fair

market value of the warrant on a non-marketable minority interest was approximately $3 million. After the Builders Square acquisition, Centers Holdings owned and operated the Builders Square chain.

### b. *The Hechinger LBO*

On September 25, 1997, BSQ Acquisition acquired Hechinger through a triangular merger. A bank group assembled by Chase Securities and led by Chase ("the Chase Bank Group") financed both the Builders Square acquisition and Hechinger LBO. The Chase Bank Group loaned the face amount of $171 million to BSQT ("the BSQT Loan"), which, after the deduction of fees and expenses, amounted to $160.8 million in capital. That loan was secured by all of BSQT's inventory, accounts receivable, and equipment. On September 25, 1997, the Chase Bank Group also loaned Hechinger Stores $112 million ("the CIT Repayment Loan"), which was used, in part, to pay off CIT, Hechinger's former working capital lenders.

BSQ Acquisition then formed Hechinger Acquisition, Inc., contributed a portion of the BSQT Loan to Hechinger Acquisition, and paid the remaining $100 million to the Hechinger shareholders, including the Hechinger and England Family Defendants, in exchange for their stock. Hechinger Company merged into Hechinger Acquisition and became a wholly-owned subsidiary of BSQ Acquisition, a wholly-owned subsidiary of Centers Holdings.

The inventory owned by Hechinger Company and BSQT was then transferred in a series of steps to Hechinger Investment Company of Delaware ("HICD"), which became the "Permanent Borrower" under a $600 million secured loan made by the Chase Bank Group ("the Chase Loan") pursuant to a Credit Agreement, dated September 26, 1997. BSQ Acquisition, BSQT, Hechinger, Hechinger Stores, and Hechinger Stores East Coast Company were also parties to the Credit Agreement. A $243 million portion of the Chase Loan was used to pay off the BSQT Loan ($127 million of which had been used to pay fees and to cash out the Hechinger shareholders) and the CIT Repayment Loan. Pursuant to a Security Agreement, dated September 26, 1997, Hechinger pledged all of its inventory, accounts receivable, and equipment as security for the Chase Loan, and the Chase Bank Group obtained guarantees from all of HICD's affiliates. The parties also executed a Pledge Agreement, dated September 26, 1997, under which all Hechinger affiliates pledged their equity interests in any Hechinger subsidiary corporations or other entities.

In these transactions, the Debtors paid various fees and finance charges totaling $27.9 million, $2 million more than the equity capital contributed to the Transaction by Leonard Green through GEI II. Secured debt increased by at least the $127 million debt used to pay fees and to buyout the shareholder defendants. The Company emerged out of the transaction with a debt to capital ratio of 95.6% in the case of Centers Holdings (nearly three times the industry average) and 71.9% in the case of Hechinger. The Committee alleges that the Transaction caused harm to the unsecured creditors of Hechinger by effectively "giving away" $127 million of value in transaction fees and payments to the Hechinger shareholders and replacing this value with additional secured debt that was structurally senior to that of the unsecured creditors. The Committee further alleges that at the time these transactions were consummated the various defendants knew or should have known that Hechinger was already insolvent and would inevitably collapse under its massive debt burden.

### 4. *Post–LBO Hechinger Collapses and Declares Bankruptcy*

Although Leonard Green may have envisioned that the leveraged Builders

Square–Hechinger combination would perform better than the sum of the parts, the combined company continued the deteriorating trend that had started well before the merger. Shortly after the Hechinger LBO, Moody's Investor Service lowered its ratings on Hechinger's senior notes and debentures from B3 to Caa3, which meant they were "of poor standing. Such [bonds] may be in default or there may be present elements of danger with respect to principal or interest." In the eighteen months thereafter, the combined operations of Builders Square and Hechinger continued to lose money at a high rate and suffered negative cash flows. By December of 1998, Hechinger was in a severe liquidity crisis.

On March 19, 1999, Hechinger executed an Amended and Restated Credit Agreement, which effectively increased Hechinger's credit line by $50 million. Pursuant to this Agreement, the credit line continued to be secured, not only by property previously encumbered by the earlier loans, but also by certain of Hechinger's real estate. The Chase Bank Group was replaced by a bank group led by Fleet ("the Fleet Bank Group"), and in an Assignment and Release Agreement, dated March 18, 1999, the Chase Bank Group assigned all of its rights under the Chase Loan to the Fleet Bank Group.

Ultimately, on June 11, 1999, after recently closing thirty-four Builders Square stores, Hechinger and its affiliated companies voluntarily filed for Chapter 11 protection under the Bankruptcy Code in the District of Delaware. As of the petition date, Hechinger was in the process of closing eighty-nine additional stores. In the bankruptcy proceedings, Hechinger initially argued that it could restructure its operations and emerge from bankruptcy as a reorganized company. It soon became apparent, however, that the company would

have to liquidate. On September 9, 1999, Hechinger ceased its operations and publicly announced the liquidation of all of its remaining assets.

In this adversary proceeding, the Committee claims that Hechinger's bankruptcy and liquidation were the natural consequences of this Transaction. The Committee alleges that the defendants approved the Transaction knowing that Hechinger was insolvent and knowing that the Transaction would delay, hinder, and defraud its unsecured creditors. The Committee alleges the Hechinger LBO caused substantial harm to the unsecured creditors because "Hechinger effectively gave away over $127 million of value in transaction fees and payments to Hechinger's former shareholders and replaced this value with additional secured debt that was structurally senior to Hechinger's unsecured creditors" at a time when it was clear that Hechinger could not withstand its debt obligations.

## II. DISCUSSION

### A. Legal Standard on Motions to Dismiss

The two motions presently before the court are motions to dismiss for failure to state a claim upon which relief may be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). In evaluating such motions, the court must assume the facts alleged in the amended complaint to be true and draw all factual inferences in favor of the non-moving party, the Committee. *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir.1991). Thus, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The issues before the court, there-

fore, are whether the allegations of the amended complaint state claims for fraudulent conveyance, breach of fiduciary duty, and unjust enrichment.

### B. *Has the Committee Alleged a Cognizable Fraudulent Conveyance Claim?*

The Committee alleges that the series of transactions culminating in the Hechinger LBO resulted in a fraudulent conveyance that should be avoided under the Bankruptcy Code. In response, the moving defendants argue that the "settlement payment" exception to fraudulent conveyances, as codified in 11 U.S.C. § 546(e) and interpreted by the Third Circuit in *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505 (3d Cir. 1999), *cert. denied sub nom.*, 528 U.S. 1021, 120 S.Ct. 531, 145 L.Ed.2d 411 (1999), insulates from avoidance payments made by a financial institution pursuant to the LBO and thus provides a complete defense to the Committee's fraudulent conveyance claim.

#### 1. *Fraudulent Conveyance Claims and LBO's*

■ Fraudulent conveyance laws, such as the Bankruptcy Code and state statutes adopting some form of the Uniform Fraudulent Conveyance Act or the Uniform Fraudulent Transfer Act, are intended to prevent shareholders, secured creditors, and others from benefitting at the expense of others, including unsecured creditors. Fraudulent conveyance claims often arise when, as here, a company goes into bankruptcy after a highly leveraged transaction. *See generally* Raymond J. Blackwood, Note, Applying Fraudulent Conveyance Law to Leveraged Buyouts, 42 Duke L.J. 340 (1992).

■ Generally speaking, an LBO is a method of acquiring a company by which the acquiring company leverages (i.e. borrows against) the assets of the target company to finance the purchase of the target company's shares from the selling shareholders. *See generally* Bartley C. Deamer, *Special Features of Leveraged Buy-Outs*, Corporate Mergers and Acquisitions (ALI–ABA, March 5, 1992). Because in such transactions much of the equity in the acquired company is replaced by debt, the former shareholders of the acquired company are replaced by secured creditors. Clearly, the capital restructuring of a company that results from a successful LBO can provide tremendous financial rewards to the new equity holders if the company remains viable over the long term. However, when the amount of debt incurred proves too much and the leveraged company collapses into bankruptcy, the downside risk caused by the increased debt to equity ratio is borne primarily by the unsecured creditors.

■ Attempts to use fraudulent conveyance laws to avoid failed LBOs were initially somewhat controversial. While some courts initially hesitated to apply fraudulent transfer law to leveraged buyouts, *see, e.g., Kupetz v. Wolf*, 845 F.2d 842, 847–48 (9th Cir.1988) (relying on article by Baird and Jackson that argued that fraudulent conveyance laws were designed to prevent collusive transfers between debtors and their families and friends and should not be applied to LBO transactions because "the debtor-creditor relationship is essentially contractual"); *see also* Douglas G. Baird & Thomas H. Jackson, Fraudulent Conveyance Law and Its Proper Domain, 38 Vand. L.Rev. 829, 852 (1985) (explaining that "a firm that incurs obligations in the course of a buyout does not seem at all like the Elizabethan deadbeat who sells his sheep to his brother for a pittance"), the vast majority of courts now agree that extending fraudulent conveyance provisions to LBO transactions is proper. *See*

*United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1297 (3d Cir.1986) (holding that broad language of UFCA as covering every "payment of money . . . and also the creation of any lien or encumbrance" does not justify exclusion of a particular transactions such as an LBO); *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1064 (3d Cir.1992); *Mellon Bank v. Metro Communications*, 945 F.2d 635, 646 (3d Cir.1991) ("*Metro Communications*") (explaining that while "shareholders receive direct benefit in the LBO transaction as they are cashed out . . . The target corporation, however, receives no direct benefit to offset the greater risk of now operating as a highly leveraged corporation."); *see also Brandt v. Hicks Muse & Co., Inc. (In re Healthco Int'l, Inc.)*, 195 B.R. 971, 979–80 & n. 5 (Bankr.D.Mass. 1996) (stating that "[i]t is well settled that fraudulent transfer law applies to a leveraged buyout"); *Wieboldt Stores v. Schottenstein*, 94 B.R. 488, 500 (N.D.Ill.1988) (finding that LBO transactions are not exempted from statutory fraudulent conveyance claims); *Crowthers McCall Pattern Inc. v. Lewis*, 129 B.R. 992, 998 (S.D.N.Y. 1991) (stating that "leveraged buy out[s] . . . can harm creditors in exactly the way fraudulent conveyance laws are designed to prevent" and noting that "it would be inappropriate for courts in determining the rights of creditors of a corporation to turn a blind eye to the fact that the loan proceeds were merely passed through the corporation to the shareholders"); *see generally* John C. Murray, Creditors' Rights in Loan Transactions, 474 PLI/Real 437, 470–74 (2001) (hereinafter "Creditors' Rights") (discussing application of fraudulent transfer law to LBOs).

■ While fraudulent conveyance claims can be brought on grounds of either intentional or constructive fraud, the claims at issue in this case, like most fraudulent conveyance claims, apparently seek to rely on the constructive fraud proofs such that the party asserting the claim need not prove intent. To prove constructive fraud under the Bankruptcy Code, the Committee must prove both (i) that the transfer was made for less than a "reasonably equivalent value," *see Metro Communications*, 945 F.2d 635, 646 ("The touchstone [of a fraudulent conveyance] is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred."); and (ii) that the post-transaction capital was inadequate for the business. *See id.* at 648–49 (discussing undercapitalization or insolvency prong of fraudulent conveyance). This second requirement may be proved by demonstrating (i) that the borrower was insolvent on the date the transfer was made, (ii) was engaged in a business for which the remaining capital was unreasonably small, or (iii) intended to incur debts beyond its ability to repay them. *See In re Healthco*, 195 B.R. at 980; *see also* Creditor's Rights, 474 PLI/Real at 474–84 (discussing the various tests for determining whether the post-transaction capital is unreasonably inadequate for the acquired corporation).

■ Thus, leveraged buyouts will not be deemed fraudulent where the parties entering the transactions reasonably believed that the acquired company would be solvent when it emerged or that it would have a "fair chance to survive financially." In such cases, value is exchanged for value. However, in cases where the parties anticipate an upcoming liquidation that is prejudicial to the general creditors, the transaction may be deemed a fraudulent conveyance.

Here, the Committee has alleged that the transfer was made for less than reasonable value and that the post-transaction

capital was inadequate for business. The amended complaint alleges that "the Debtors received less than fair consideration—indeed, no consideration—for the Shareholder Payments" and that

the Debtors (i) were insolvent on the date that the Shareholders Payments were made or became insolvent as a result of the Shareholder Payments, or [ (ii) ]were about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; and/or (iii) intended to occur, or believed that they would incur, debtors that would be beyond their ability to pay as such debts matured.

Am. Compl. ¶ 142–43.

Defendants do not dispute that the Committee has pled a prima facie case for fraudulent transfer. Rather, they submit that the Committee's fraudulent transfer claim is barred because the transaction at issue constituted an unavoidable "settlement payment." *See* 11 U.S.C. § 546(e).

### 2. The Settlement Payment Defense to Fraudulent Conveyance Claims

#### a. History and Judicial Treatment of the Settlement Payment Defense

Bankruptcy Code section 544(b), upon which the Committee bases its fraudulent conveyance claim, authorizes the bankruptcy trustee to "avoid any transfer of interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law ..." 11 U.S.C. § 544(b). Section 546(e) of the Code, however, eliminates this avoidance power when the transfer in question is a securities "settlement payment." It states, in relevant part:

Notwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(v) of this title, the trustee may not avoid a transfer that is a ... settlement payment, as defined by section 101 or 741 of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of this case, except under section 548(a)(1)(A) of this title.[4]

11 U.S.C. § 546(e). The moving defendants claim that the payments made to the former shareholders in exchange for their shares are unavoidable "settlement payments," under section 546(e).

The settlement payment defense, as applied to LBO-based fraudulent conveyance claims, was one of first impression before the Tenth Circuit in *In re Kaiser Steel Corp.*, 952 F.2d 1230 (10th Cir.1991). In *Kaiser Steel*, the Tenth Circuit held that § 546(e) insulates from avoidance payments made for the benefit of shareholders pursuant to an LBO. Soon thereafter, in a case involving a repo transaction in which securities were transferred, the Ninth Circuit, in *In re Comark*, 971 F.2d 322, 324 (9th Cir.1992), similarly took a broad view as to what transactions can constitute unavoidable "settlement payments."

These broad readings of § 546(e) were not without controversy among the federal courts. For example, in one prominent case, the United States District Court for the Northern District of Illinois disagreed with the holdings in *Kaiser Steel* and *In re Comark*. In *Wieboldt Stores v. Schottenstein*, 131 B.R. 655, 663–65 (N.D.Ill.1991), the court examined the legislative history of the statute and determined that the purpose of § 546(e) was to protect the clearance and settlement chain. Specifically, the *Wieboldt* court stated that the rationale behind exempting settlement

---

4. Code section 548(a)(1)(A) is inapplicable here because the transfer at issue took place more than one year before the debtors commenced their bankruptcy cases.

payments from the avoidance powers of the bankruptcy representative was to prevent the bankruptcy of one party in a clearance or securities purchasing chain from spreading to other parties and possibly threatening the collapse of the securities market. The court explained that this purpose would not be adversely affected by its ruling because requiring the defendants to return the payments they received in the LBO would not pose any significant threat to those in the clearance and settlement chain. Therefore, the court held § 546(e) to be inapplicable to leveraged buyout payments to shareholders.

Various commentators have agreed with the district court's approach in *Wieboldt* and criticized *Kaiser's* broader reading of § 546(e), which has the effect of insulating participants in LBO transactions from fraudulent transfer liability. *See, e.g.,* Neil M. Garfinkel, Note, No Way Out: Section 546(e) Is No Escape for the Public Shareholder of a Failed LBO, 91 Colum. Bus. L.Rev. 51 (1991); Jane Elizabeth Kilker, Note, Judicial Repeal of Fraudulent Conveyance Laws: *Kaiser Steel Corp. v. Charles Schwab & Co.,* 14 Hamline L.Rev. 453 (1991). Additionally, a number of other courts have refused to follow *Kaiser* on policy grounds. *See, e.g., Jewel Recovery, L.P. v. Gordon,* 196 B.R. 348 (N.D.Tex. 1996) (criticizing courts that read the settlement payment exception too broadly and reasoning that "the affirmative application of § 546(e) to this transaction would serve to sanction the practice of structuring private stock purchases in an effort to circumvent the avoidance section, merely by utilizing a financial institution"); *In re Adler,* 263 B.R. 406, 475–84 (S.D.N.Y.2001) (affirming bankruptcy court's determination that § 546(e) does not apply based on a number of considerations that counsel against allowing § 546(e) to insulate from avoidance the transaction at hand and noting that the application of § 546(e) in this case "would give a blessing to an ... integrated scheme to defraud ....").

Still other courts have found that the settlement payment exception of § 546(e) does not provide a defense under the facts of their cases. Perhaps most notably among these cases, was the Eleventh Circuit's decision in *Munford v. Valuation Research Corp. (In re Munford),* 98 F.3d 604 (11th Cir.1996), which added a new wrinkle to the § 546(e) analysis. There, the Eleventh Circuit found § 546(e) to be inapplicable to bar fraudulent transfer claims where the financial institution is "nothing more than an intermediary or conduit [and] never acquired a beneficial interest in the shares." [5] *Id.* at 610; *see also In re Healthco Int'l, Inc.,* 195 B.R. 971 (using similar analysis to that of *Munford* in finding that financial institution acting as intermediary was not a "transferee").

### b. *Lowenschuss v. Resorts International, Inc.*

It was upon this backdrop that the Third Circuit, in *Resorts International,* 181 F.3d 505, considered whether the settlement payment defense could insulate payments made to shareholders in an LBO transaction. Most significant for the parties in this case, it rejected the narrower approach towards the section 546(e) settlement payment defense that was taken in cases such as *Wieboldt* and *Munford.* Rather, finding the plain meaning of "settlement payments" to be unambiguous, the

---

**5.** This approach seems to be grounded in the "mere conduit rule" developed in earlier fraudulent transfer cases, which states that mere financial intermediaries for the transfer are not "transferees" for the purposes of fraudulent transfer liability. *See Bonded Financial Servs., Inc. v. European Am. Bank,* 838 F.2d 890 (7th Cir.1988).

*Resorts International* court declined to base its opinion upon the sections of the legislative history of the statute that those courts relied upon. *Resorts International,* 181 F.3d at 515 ("When the language is clear, no further inquiry is necessary unless the plain language leads to an absurd result."). Thus, in *Resorts International,* the Third Circuit rejected the *Wieboldt* court's analysis of the rationale behind section 546(e) and, like *Kaiser,* instead focused on the plain meaning of the statutory language.

In considering whether payments made through a bank to shareholders in an LBO fall under the statutory exemption of section 546(e), the *Resorts International* court stated that:

> Despite the fact that payments to shareholders in an LBO are not the most common securities transaction, we see no absurd result from the application of the statute's plain language and will not disregard it.

*Resorts International,* 181 F.3d at 517. The *Resorts International* court thus concluded, in agreement with *Kaiser,* that payments made by a financial institution to shareholders as part of a leveraged buyout or cash-out merger are "settlement payments" within the meaning of section 546(e). Moreover, based on the plain language of the statute, the *Resorts International* Court held section 546(e) protects from avoidance powers settlement payments made "by ... a financial institution," regardless of whether such institution is an intermediary that does not hold a beneficial interest in the funds they handle. In so doing, the Third Circuit expressly rejected the Eleventh Circuit's decision in *Munford.* Instead, the *Resorts International* court found the *Munford* dissent persuasive because it too relied solely on the plain meaning of the text of the statute. Thus, the *Resorts Interna-*

*tional* court concluded that "[a] payment for shares during an LBO is obviously a common securities transaction, and we therefore hold that it is also a settlement payment for the purposes of Section 546(e)." *Id.* at 516.

Thus, while other circuits, have in some instances determined that the settlement payment exemption should not be applied to LBO transactions, the Ninth, the Tenth, and (most importantly for this court) the Third Circuits have concluded that the term "settlement payments" within section 546(e) should be read broadly. *See In re Kaiser Steel Corp.,* 952 F.2d at 1239–41 (consideration paid to shareholders for their stock in connection with a leveraged buyout constitutes unavoidable "settlement payment."); *In re Comark,* 971 F.2d at 324 (debtors' return of securities that had served as additional margin in repo transaction constitutes unavoidable "settlement payment."); *Resorts International,* 181 F.3d at 517 (consideration paid to shareholders for their stock in connection with a leveraged buyout constitutes unavoidable "settlement payment."); *see also Bevill, Bresler & Schulman v. Spencer Sav. & Loan,* 878 F.2d 742, 745 (3d Cir.1989) (prepetition transfer of federal government securities repurchase agreements by securities dealer to purchases constitutes unavoidable "settlement payment"); *Walsh v. The Toledo Hosp. (In re Financial Mgmnt. Sciences),* 261 B.R. 150, 154–56 (Bankr.W.D.Pa.2001) (noting that "the scope of the term 'settlement payment' is extremely broad and finding that 546(e) provides complete defense to fraudulent conveyance claim at issue"). Moreover, the Third Circuit in *Resorts International* expressly held that section 546(e) is applicable to LBO transactions such as the one before the court in this case.

#### c. *The Parties' Contentions*

Based on this understanding of how the settlement payment defense is to be applied in the courts of this circuit, the court now turns to the parties' contentions.

Relying on the Third Circuit's reading of section 546(e), the defendants contend that the Committee's fraudulent conveyance claims are barred because the payments for the shares during the LBO are unavoidable "settlement payments" made "by or to" a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency. 11 U.S.C. § 546(e). They submit, therefore, that the Committee's fraudulent transfer claims must be dismissed.

The Committee, in response, raises a number of arguments as to why, even in light of the Third Circuit's holding in *Resorts International,* section 546(e) should not apply to the transaction at issue. First, the Committee contends that section 546(e) does not apply to the Hechinger LBO because the disbursing agent to whom payments were made, Chase Mellon Financial Services, L.L.C., was not a "financial institution" within the meaning of the Bankruptcy Code. Second, citing *Munford* and *Jewel Recovery,* the Committee claims that the mere appointment of a disbursing agent to pay controlling shareholders in an LBO or similar transaction does not trigger the settlement payment defense. Third, the Committee claims that *Resorts International* is distinguishable from the case at hand, because in that case the transfer of securities and cash were accomplished through a stock broker and also because in that case the LBO payments were made to non-insiders while in this case the LBO payments were made to insiders. Alternatively, the Committee argues that if section 546(e) is interpreted to protect the transfers at issue, it violates the Equal Protection Clause of the Four-teenth Amendment and is therefore unconstitutional because it arbitrarily discriminates between creditors whose debtors have filed bankruptcy proceedings and those debtors who have not.

#### d. *The Court's Analysis*

█ For the reasons set forth below, the court finds each of the arguments made by the Committee to be unavailing in the light of the Third Circuit's holding in *Resorts International.* Moreover, the court finds that section 546(e) is constitutional and that its application to this case requires the court to dismiss the fraudulent transfer claims against both sets of moving defendants.

##### (i) *Does Resorts International compel the application of the settlement payment defense to this transaction?*

Although the Committee acknowledges that *Resorts International* governs this case, it then "respectfully submits" that Resorts International was "erroneous" and should not be applied here. No matter what this court's view is of the correctness of the holding in *Resorts International,* this court is not free to disregard controlling case law of this circuit. Thus, given that the court in *Resorts International* found that section 546(e) is generally applicable to LBO transactions and that *Resorts International* is binding as direct controlling precedent on this court, the court will proceed by determining whether this case is distinguishable from *Resorts International.*

The Committee primarily contends that section 546(e) does not apply because the payments were not made "by or to" a financial institution. It states that the disbursing agent, Chase Mellon Financial, cannot be a financial institution within the meaning of the Code because it acted solely as an intermediary without acquiring any beneficial interest in the shares. This

very argument was considered and rejected by the Third Circuit in *Resorts International*. *Resorts International*, 181 F.3d at 516. As noted above, the plaintiff in *Resorts International* similarly urged the court to follow the Eleventh Circuit's *Munford* decision, in which the Eleventh Circuit held section 546(e) inapplicable where the paying agent, a bank "was nothing more than an intermediary or conduit." In that case, "[f]unds were deposited with the bank and when the bank received the shares from the selling shareholders, it sent funds to them in exchange. The bank never acquired a beneficial interest in either the funds or the shares." *Munford*, 98 F.3d at 610. The "intermediary or conduit" exception to section 546(e) was expressly rejected by the *Resorts International* court, based on its reading of the plain language of the statute. Section 546(e) does not require the financial institution to acquire a beneficial interest; rather, it broadly protects from trustee's avoidance powers settlement payments made " 'by . . . a financial institution.' " *Resorts International*, 181 F.3d at 516. Because this court must follow the law of this circuit, as set forth in *Resorts International*, the court must also reject this argument.

The Committee next seeks to distinguish this case from *Resorts International* in two additional ways. First, the Committee notes that in *Resorts International*, transfer of securities and cash were accomplished through a stockbroker, Merrill Lynch, while in this case, the transfer was accomplished through a financial institution.[6] It is clear from reading *Resorts International*, however, that in this context the Third Circuit draws no distinction between brokers, banks, and other finan-

cial institutions. The court did not rely on Merrill Lynch's status as a "stockbroker" in applying section 546(e); to the contrary, it specifically stated that "although no clearing agency was involved in this transfer, two *financial institutions*—Merrill Lynch and Chase—were." *Id.* at 515 (emphasis added). Therefore, the court finds that it makes no difference that the payments in *Resorts International* were forwarded first to Merrill Lynch, the shareholders' broker. So long as a financial institution is involved, the payment is an unavoidable "settlement payment."

Second, the Committee argues that this court should read *Resorts International* as holding only that "an LBO payment to a *non-insider* was the subject to the section 546(e) defense." Because this case involves payments to insiders, the Committee argues, the holding of *Resorts International* does not apply. While this is a factual distinction between the two cases, the court's reading of *Resorts International* confirms that it is not one that holds legal significance under section 546(e). The Third Circuit did not rely on Lowenschuss' non-insider status in applying section 546(e), but instead relied on the plain meaning of the statute. The statute itself has no exception to its application that is based on the status of the selling shareholder.

Finally, the Committee claims that there is an issue of fact as to whether Chase Mellon, the disbursing agent in this case, is a "financial institution," asserting that because Chase Mellon's name "does not even include the words 'bank' or 'savings and loan,' " it is not a financial institution within the meaning of the Bankruptcy Code. Clearly a financial institution need not include the words "bank" or "saving

---

**6.** The Committee also contends that the disbursing agent is not a "financial institution" or that whether the disbursing agent is a

financial institution is a factual matter that is disputed between the parties. The court will address this contention below.

and loan" in its name to be a financial institution.[7] Moreover, it is clear, based on the wire transfer documents, that the money was distributed by Chase Mellon to Hechinger shareholders in exchange for their shares. Accordingly, like the intermediary in *Resorts International*, the disbursing agent qualifies as a "financial institution" for purposes of section 546(e). Because the payments in were made "to" a "financial institution," these payments are unavoidable under section 546(e).

### (ii) *Is section 546(e) unconstitutional as applied?*

█ The Committee's final argument is that section 546(e) of the Bankruptcy Code works an unconstitutional violation of equal protection because it arbitrarily distinguishes between "creditors whose debtors have filed bankruptcy proceedings and those [creditors whose] debtors . . . have not." This argument fails because the Committee cannot satisfy its burden of proving that there is no rational basis for section 546(e)'s disparate treatment of different creditors. *See Brian B. v. Commonwealth of Penn. Dep't of Educ.*, 230 F.3d 582, 586 (3d Cir.2000) ("In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous."). Indeed, this very distinction is the entire point of the federal Bankruptcy Code, which was implemented pursuant to the constitutional grant to Congress of power to make "uniform Laws on the subject of Bankruptcies." U.S. Const. art. I, § 8, cl. 4. Those that file petitions for bankruptcy enjoy the protections of the Bankruptcy Code, while those

that do not, cannot avail themselves of such protections.

More specifically, with reference to section 546(e), it is clear from the case law and legislative history of that statute that the broad avoidance power given to a trustee in bankruptcy, *see Moore v. Bay (In re Estate of Sassard & Kimball, Inc.)*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931), led to the potential risk that the avoidance of a major transfer would have a disruptive effect on settled securities transactions. To address this danger, Congress passed section 546(e) to narrow the trustee's avoidance power under certain circumstances to protect "the nation's financial markets from the instability caused by the reversal of settled securities transactions." *Kaiser*, 913 F.2d at 848. Section 546(e) thus represents Congress's determination that the type of transfer at issue here— settlement payments to shareholders, made by or to a financial institution— should remain unavoidable in order to insulate the clearing and settlement system of the nation's securities industry, and participants in that system, from the potentially devastating effect of a substantial recovery by a trustee that would require the undoing of possibly thousands of settled securities transactions. *See id.* ("The danger of a 'ripple effect' on the entire market is at least as inherent in the avoidance of an LBO as it is in the avoidance of a routine stock sale."). While this determination may seem over-broad to some, this court cannot conclude that this prophylactic measure is irrational.

The Committee has not met its burden in demonstrating that this determination

---

**7.** The England Defendants also note that Chase Mellon, which is now called Mellon Investor Services, is part of Mellon Financial Corporation, the 24th largest bank holding company in the United States, ranked by as-

serts, as of June 30, 2001. *See* Website for National Information Center of the Federal Reserve System, <*http://www.ffiec.gov/nic/default.htm*> (Last visited February 7, 2002).

or the application of section 546(e) based on the plain language of the statute is irrational. Accordingly the court finds that section 546(e) is constitutional. Therefore, based on the above analysis, the court will grant the Hechinger Defendants' and the England Family Defendants' motions to dismiss the fraudulent conveyance claims against them.

### C. Has the Committee Alleged a Cognizable Breach of Fiduciary Duty Claim?

■ The Committee also alleges that the former Hechinger director's and controlling shareholder's approval of the merger that set into motion the series of transactions culminating in the LBO of Hechinger was a breach of fiduciary duty owed to the creditors.[8] The Hechinger Defendants contend that they cannot be liable for a breach of fiduciary duty because they only approved the Builders Square acquisition, but did not approve the challenged LBO transaction. The England Family Defendants claim that they cannot be liable for a breach of fiduciary duty because at the time of the Hechinger LBO they did not have voting rights on the Hechinger shares that they owned.

#### 1. Breach of Fiduciary Duties to Creditors

■ This case is somewhat unusual because it alleges a breach of fiduciary duties that are due to creditors. Traditionally, under Delaware law, directors owe fiduciary duties to the corporation and its stockholders. Conversely, the relationship between directors and creditors ordinarily is not fiduciary, but is contractual in nature. See Katz v. Oak Indus. Inc., 508

A.2d 873 (Del.Ch.1986) ("the terms of the contractual relationship agreed to and not broad concepts such as fairness define the corporation's obligation to its bondholders."). At the moment a corporation becomes insolvent, however, the insolvency triggers fiduciary duties for directors for the benefit of creditors. See Geyer v. Ingersoll Pubs. Co., 621 A.2d 784, 787 (Del. Ch.1992); see generally, Robin E. Phelan, If Their Business Judgment Was So Good How Come They're In Bankruptcy and Other Perplexing Mysteries of the Business Judgment Rule: Corporate Governance Issues for the Financially Troubled Company, 10 J. Bankr.L. & Prac. 471, 475–76 (Sept/Oct 2001) (hereinafter, "Corporate Governance Issues"). This is because when a corporation enters the zone of insolvency, the creditors—and not just the shareholders—are residual risk bearers whose recovery is dependent upon business decisions of the directors. In other words, in an insolvency situation, the directors can be said to be "playing with the creditors money."

■ According to Chancellor Allen in Credit Lyonnais Bank Nederland, N.V. v. Pathe Comm. Corp., 1991 WL 277613 (Del. Ch. December 30, 1991), in insolvency, the directors' (and assumedly controlling shareholders') fiduciary duties are to multiple constituencies. Allen stated that in insolvency the duty runs not directly to the creditors but to the "community of interest." Id.; see also Geyer, 621 A.2d 784 (Del.Ch.1992). It thus appears that while this duty does not necessarily place creditor interests ahead of the interests of stockholders, it requires the board to maximize the corporation's long-term wealth creating capacity. See Corporate Gover-

---

**8.** Whereas the remedy for a fraudulent transfer claim is avoidance of the transfer and recovery from the transferee, the remedy for breach of fiduciary duty claim is a money judgment against the directors and their aiders and abettors. See Jewel Recovery, 196 B.R. at 353; In re Healthco, 208 B.R. at 309–10; Crowthers, 129 B.R. at 999.

nance Issues, 10 J. Bankr.L. & Prac. at 476.

Here it is alleged that "Hechinger was insolvent at the time of the [Hechinger LBO] or was rendered insolvent as a result of the Transaction" and that:

> [b]y virtue of Hechinger's insolvency and their status as [directors and] controlling shareholders, the Hechinger [Defendants and the England Family Defendants] had fiduciary duties to Hechinger and its unsecured creditors to ... (i) preserve and maximize the value of Hechinger's assets for the benefit of such creditors and (ii) act in a manner that would not injure the Debtors and such creditors.

Am. Compl. ¶ 104, 105.

Taking the allegation that Hechinger was insolvent at the time of the LBO as true, the defendants, as controlling shareholders and directors, cannot and do not contend that they do not owe certain fiduciary duties to the unsecured creditors. However, the defendants claim that, even assuming that the facts alleged are true as the court must in a motion to dismiss, they could not be said to have breached those duties as a matter of law.

**2. *The Hechinger Defendants' Motion to Dismiss the Fiduciary Duty Claims***

While the Committee alleges that the Builders Square acquisition and the Hechinger LBO were one "integrated transaction," the Hechinger Defendants claim that the only transaction that they voted for—and thus the only transaction that they could be said to be fiduciaries of the unsecured creditors—was the acquisition of Builders Square. Thus, the Hechinger Defendants claim that because the damage that the Committee complains of is alleged to have arisen from the Hechinger LBO and not from the Builders Square acquisition, they have breached no fiduciary duties to the Committee.

In reply, the Committee argues that the amended complaint alleges that by approving "the Transaction—defined to include both the Hechinger LBO and the Builders [Square] Merger—the directors breached their fiduciary duties to creditors." *See* Am. Compl. ¶ 94 ("The Directors ... approved both the Hechinger LBO and the Builders Square Merger...."). It further notes that the amended complaint also alleges that the Builders Square acquisition independently harmed the unsecured creditors because Hechinger did not receive reasonably equivalent value in exchange for those assets. The Committee also contends that collapsing the transactions for the purposes of analyzing the breach of fiduciary duty claims would be appropriate here. *See Wieboldt,* 94 B.R. at 502 (collapsing LBO transaction for purposes of breach of fiduciary duty). Moreover, the Committee claims that even if collapsing were found to be inappropriate, the amended complaint nonetheless makes clear that because the defendants knew that by approving the Builders Square acquisition, they also were approving the Hechinger LBO "because the defendants knew that all parts of the Transaction were interdependent and cross-conditional." *See id.* ¶ 3, 82. Therefore, the Committee concludes that all of the harm to the unsecured creditors alleged in the amended complaint was the foreseeable result of their misconduct.

In essence, the Hechinger Defendants argue that they merely approved the merger step of the LBO, and not the pledging of the post-LBO debtor's assets. Drawing all inferences in favor of the Committee, the court finds that the amended complaint states a claim for breach of fiduciary duty against the Hechinger Defendants. Regardless of the various complex structures of leveraged buyouts, which often involve various loans,

stock purchases, mergers, and repayment obligations, courts have found that a set of transactions may be viewed as one integrated transaction if the transactions "reasonably collapse into a single integrated plan and either defraud creditors or leave the debtor with less than equivalent value post-exchange." *CPY Co. v. Ameriscribe Corp.*, 145 B.R. 131, 137 (Bankr.S.D.N.Y. 1992). In *Tabor Court Realty*, the Third Circuit agreed that the district court properly collapsed the steps of an LBO transaction in that case in order to determine fraudulent conveyance liability and stated that the district court "looked beyond the exchange of funds between [the lender] and the [debtors]" because "[t]he two exchanges were part of one integrated transaction." *Tabor Court Realty*, 803 F.2d at 1302.

Courts thus focus "not on the structure of the transaction but the knowledge and intent of the parties involved in the transaction." *Wieboldt*, 94 B.R. at 502. *Healthco*, 195 B.R. at 984–85, is a good example of this tendency and is particularly instructive because of its factual similarity to this case. There, the court denied a motion to dismiss a breach of fiduciary duty claim against directors and controlling shareholders. In *Healthco*, the board had approved a merger agreement with a corporation formed by the acquirer, a leveraged buyout firm. The acquiring corporation then made a tender offer for all of the debtor's shares. *Id.* at 978. There, like here, the LBO was conditioned on the acquirer's ability to obtain financing to fund the tender offer. *Id.* The *Healthco* court did not base its holding on collapsing the transactions, but rather simply noted that it was sufficient that "it was reasonably foreseeable the LBO would bring about the company's subsequent failure." *Id.* at 985.

At this stage of the case, the court is reluctant to conclude that because the defendants structured the set of transactions in a certain manner, they are immune from a claim of breach of fiduciary duty, especially where the Committee alleges that the harms it complains of were foreseeable results of the acts of the defendants. Therefore, the court concludes that for any of the following reasons, the Hechinger Defendants' motion to dismiss the fiduciary duty claims against them must be rejected: (i) it is alleged that the approval of the Builders Square Merger was an independent harm that constituted a breach of fiduciary duty; (ii) the court cannot at this point say that the Builders Square acquisition and Hechinger LBO are not collapsible into one integrated transaction; (iii) even if the transactions are found on a more complete record to not be collapsible, the Committee has nonetheless stated a cause of action for breach of fiduciary duty based on the foreseeability of the alleged harm. Accordingly, the court will deny the Hechinger Defendants' motion to dismiss.

### 3. *The England Family Defendants' Motion to Dismiss the Fiduciary Duty Claims*

 The England Family Defendants also contend that they could not have breached their fiduciary duty as a matter of law. The England Family Defendants argue that while they were shareholders of Hechinger, they had relinquished their voting rights in the stock long before the Builders Square Merger and Hechinger LBO took place. Because they were neither directors, officers, nor controlling—or even voting—shareholders, the England Family Defendants claim that they owned no one any fiduciary duties. Thus, they argue the Committee's claim for breach of fiduciary duties against them must fail as a matter of law.

The Committee alleges that the "Hechinger Family Defendants," a grouping that includes both the Hechinger Defendants and the England Family Defendants, "by and through a Stockholders Agreement, controlled the voting on all matters to which Hechinger's shareholders voted prior to the Transaction." It further alleges that each of the "Hechinger Family Defendants" "agreed to vote their shares in one block in all significant matters, including, without limitation, the vote with respect to the Transaction." Am. Compl. ¶ 107. The England Family Defendants contend that as a matter of law this allegation cannot state a claim for a breach of fiduciary duties against them, because they did not have the right to vote their Hechinger shares at the time of the Transaction. To demonstrate this, they point out that the Stockholders Agreement, which is cited in the Committee's allegations, was entered into pursuant to a voting trust created in 1989 that was still in effect in September 1997.[9] That voting trust states, in relevant part, that:

> Each member of the England Family Group grants to Voters an irrevocable proxy coupled with an interest, to vote such person's Subject Shares as the Voters shall in their sole discretion determine, subject only to [certain limitations relating to the election of England Family designees to the Board of Directors],[10] for the election of directors and all other matters which may be presented at any meeting or require the consent of the stockholders of the Company.

As a consequence of this voting arrangement, the England Family Defendants irrevocably parted with the right to vote their shares for a period of ten years. John W. Hechinger, John W. Hechinger, Jr., and S. Ross Hechinger exercised total discretion over the decision how to cast the England Family Defendant's votes. By entering into the voting trust, the England Family Defendants relinquished control over the management of Hechinger, including any decision whether to approve or reject the transactions that the Committee challenges in this lawsuit. *See Winitz v. Kline*, 288 A.2d 456, 459 (Del.Ch.1971) ("A stockholder who deposits his stock in a voting trust parts with his voting rights but retains 'beneficial' ownership."). Therefore, according to the England Family Defendants, because they did not vote their shares and did not even have the right to vote their shares at the time of the transactions at issue, they can not be considered to be "controlling shareholders" whose acts could constitute a breach of fiduciary duty.

The Committee, in response, characterizes the voting trust arrangement as a proxy under which the Hechinger family members voted the England Family Defendants' shares. It argues that even in light of the voting arrangement discussed above, the England Family Defendants nonetheless can be held liable under established principles of agency. *See Vicksburg & M.R. Co. v. O'Brien*, 119 U.S. 99, 104 (1886) ("The acts of an agent, within the scope of the authority delegated to him, are deemed the acts of the principal."); *Rice & Hutchins, Inc. v. Triplex Shoe Co.*,

**9.** These agreements are properly considered by the court in resolving the defendants' motions to dismiss. *See ALA Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n. 8 (3d Cir.1994) ("Where there is a disparity between a written instrument annexed to a pleading and an allegation

in the pleading based thereon, the written instrument will control.")

**10.** These provisions are not implicated here because, in 1997, the England Family Defendants did not have the necessary percentage required to exercise control in this manner.

147 A. 317, 322 (Del. Ch.1929) ("A person acting as proxy for another is but the latter's agent and owes to the latter the duty of acting in strict accord with those requirements of a fiduciary relationship which inhere in the conception of agency."). The Committee asserts that the England Family Defendants' proxies were part of the controlling block of shares cast by the shareholders who allegedly breached fiduciary duties to Hechinger and its creditors by approving the Builders Square acquisition and Hechinger LBO. Accordingly, the Committee argues, the amended complaint states a breach of fiduciary duty claim against the England Family Defendants, because as principals they remain bound by the acts of their agents.

 Under Delaware law, fiduciary duties are owed only by directors, officers, or controlling shareholders. *See Harris v. Carter,* 582 A.2d 222, 234 (Del.Ch.1990). The parties do not dispute that, at the time of the transactions at issue, none of the England Family Defendants was an officer or director of Hechinger. The parties disagree as to the effect of the voting arrangement that governed the voting rights of the England Family Defendants' shares—i.e., whether the voting arrangement strips the England Family of liability for any breach of fiduciary duty claim against controlling shareholders.

The voting arrangement between the England Family Defendants and the various members of the Hechinger family comports with a voting trust, pursuant to 8 Del. C. § 218; it is not simply a grant of proxy, pursuant to 8 Del. C. § 212, under which the Hechinger family members simply act as agents of the England Family Defendants. While in a proxy arrangement, the beneficial owner of the shares directs another party to vote in a particular way or agrees to vote his shares in a particular way, a voting trust is the irrevocable parting of the right to vote at all. Here, the England Family Defendants gave the named Hechinger family members the irrevocable right to vote the shares as those Hechinger family members "shall in their sole discretion determine." This arrangement is therefore a voting trust, in which the England's have given up the right to vote their shares. The court therefore finds that the England Family Defendants cannot be liable for the acts of the voters taken pursuant to the voting trust and will dismiss the Committee's breach of fiduciary duty claims as against the England Family Defendants.

The Committee's reliance on the agency law principles of vicarious liability that are applicable to voting proxies is misplaced. The cases cited by the Committee are inapposite, because they all discuss the agency relationship vis-a-vis proxies, but not voting trusts. It is certainly true that the person to whom a beneficial owner gives a proxy is the agent of the beneficial owner and that where the beneficial owner directs his agent to vote in a particular manner, he will be liable as a principal for his agent's actions. However, as noted above, a party who enters into a voting trust does not merely grant a right to vote his stock on one or more specific occasions, pursuant to his own directions and wishes. To the contrary, he completely gives up any voting control. *See Foye v. New York Univ.,* 269 A.2d 63, 69 (Del.1970) ("A 'beneficiary' of a voting trust ... is the stockholder concerned with, and relieved of, the vote and control of the corporation."). In such a case, the person voting the shares cannot be said to be the agent of the beneficial owner because the person voting the shares is free to exercise his independent discretion on how to vote.

To put it simply, the reason that controlling shareholders can be liable for breaches of fiduciary duty is because their votes

can cause the corporate entity to enter into transactions that harm the corporation but benefit those shareholders personally. In this case, the England Family Defendants did not retain any control over their right to vote the Hechinger shares. Rather, according to the voting trust agreement entered between the England Family Defendants and certain Hechinger family members eight years before the Hechinger LBO occurred, the Hechinger family members who held the voting rights to the England Family Defendants' shares had the sole power "to vote such ... Shares as [they] shall in their sole discretion determine."

Whether one labels the voting arrangement a proxy or a voting trust, the relevant inquiry—for purposes of assessing whether the England Family Defendants can be liable for any breach of duty based on the way the shares are voted—focuses on whether the shareholder retained any voting control. Where, as here, those alleged to liable by virtue of their position as a controlling shareholders are without the power to vote their shares, it would be inappropriate to hold them liable for a breach of fiduciary duty. Accordingly, the court will dismiss the Committee's claim for breach of fiduciary duty as against the England Family Defendants.

### D. Has the Committee Alleged a Cognizable Unjust Enrichment Claim?

The Unsecured Creditor's Committee also alleges that the Hechinger Defendants and England Family Defendants were unjustly enriched "through the wrongful receipt of proceeds of the Hechinger LBO." Am. Compl. ¶ 113. In support of their motions to dismiss, both sets of defendants argue that this claim should be dismissed for three reasons. First, they argue that this claim is preempted by section 546(e) of the Bankruptcy Code. Second, they ar-

gue that the Committee lacks standing to assert this claim, because a bankruptcy trustee (or a committee acting in the trustee's stead) has not standing to pursue a claim for damages sustained by specific individual creditors rather than by the estate or by all creditors as a group. Last, they argue that the Committee's complaint fails to allege the required elements of unjust enrichment.

In opposition to the defendants' motions the Committee challenges each of the three arguments made by the moving defendants. First, the Committee asserts that its unjust enrichment claim is not preempted by the Bankruptcy Code. Next, with respect to the defendants' standing argument, the Committee responds that although it does not have standing to bring claims on behalf of individual creditors, it does have standing to assert a claim for unjust enrichment on behalf of Hechinger and has done so by alleging that Hechinger itself was impoverished by the payments to the defendants. Last, the Committee submits that it has sufficiency pleaded all of the elements of an unjust enrichment claim.

Based on the court's reading of the amended complaint, the Committee has sufficiently pleaded all of the elements of an unjust enrichment claim. The Committee has alleged that (i) the payments to the defendants through an LBO (the enrichment), (ii) substantially burdened Hechinger with secured debt and greatly reduced its assets (the impoverishment), and (iii) that defendants consummated the Hechinger LBO with knowledge that Hechinger was insolvent in order to loot Hechinger for their own gain before its financial failure (demonstrating that it would be "unjust" for the defendants to retain the enrichment). While the defendants assert that the Committee has failed to plead "a relation between the

alleged enrichment and the alleged impoverishment," the court finds that the amended complaint sufficiently alleges that the impoverishment occurred because Hechinger incurred secured debt for the purpose of making the payments to the defendants for their shares.

The court must next turn to the defendants' remaining two arguments and consider whether that claim is nonetheless preempted by section 546(e) and, if it is not preempted, whether the Committee has standing to bring the claim.

1. *Is the Committee's Unjust Enrichment Claim Preempted by Section 546(e) of the Bankruptcy Code?*

■■■ Defendants argue that the unjust enrichment claim must be dismissed because it is preempted by section 546(e) of the Bankruptcy Code, by which Congress expressly limits the trustee's power to avoid the type of transfer at issue here. *See In re Continental Airlines, Inc.,* 161 B.R. 101, 104 (Bankr.D.Del.1993) (state law may be preempted where it "conflict[s] with or stand[s] as an obstacle to the implementation of specific provisions of the Bankruptcy Code"). More specifically, the defendants contend that the Committee's unjust enrichment claim conflicts with and poses an obstacle to the implementation of the Congressional objectives underlying section 546(e), which requires that the type of transfer at issue here—payments to shareholders in connection with an LBO, made by or to a financial institution or clearing agency—remain unavoidable in order to insulate the clearing and settlement system of the nation's security industry and participants in that system from the potentially devastating effect of a substantial recovery by a trustee that would require the undoing of settled securities transactions. Defendants thus argue that allowing the Committee to recover from the shareholders by asserting an unjust enrichment claim to recover the very same payments that may not be recovered under the fraudulent conveyance provisions of the Code would circumvent a specific provision of the Code.

In response, the Committee asserts that neither of the circumstances upon which courts rely in finding federal law to preempt state law is present here. The Committee argues there is no actual conflict between its unjust enrichment claim and the section 546(e) defense, because Congress has exempted from section 546(e) intentionally fraudulent transfer claims arising under section 548(a)(1) of the Code that have a similar scienter requirement as that of unjust enrichment claims. The Committee argues that this "similarity" demonstrates Congress's intent to permit claims against the transferee in this case.

Defendants further contend that because the Bankruptcy Code addresses and provides a remedy for the allegations at issue here, under sections 544 and 546(e), the Code occupies the field and preempts overlapping state law claims. In response to this argument, the Committee argues that field preemption is not applicable to its unjust enrichment because Congress left "gaping voids" in the application of section 546(e). The Committee's one example of such a "gaping void" is that 546(e) "applies to constructively fraudulent conveyance claims asserted by representatives of a bankruptcy estate on behalf of creditors, [but] not to creditors asserting fraudulent conveyance claims before a bankruptcy." Thus, the Committee argues, section 546(e) is not so broad that is has left no room for the application of supplementary state law claims, such as unjust enrichment. Last, the Committee submits that an unjust enrichment claim would not thwart Congress's goal in enacting section 546(e) of averting "[t]he danger

of a 'ripple effect' on the entire market" caused by the bankruptcy of one of the intermediaries of a securities transaction. *Kaiser*, 913 F.2d at 848–49.

■■■ Under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, § 2, state laws that interfere with or are contrary to federal law are preempted and without effect. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Federal law may preempt state law either expressly or impliedly—the latter either by occupying the field, or because state and federal laws conflict. *See, e.g., Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377, 381–82 (3d Cir.1999). In cases like this, where there is no explicit statutory language preempting state law, there are two circumstances where courts will find preemption: (i) conflict preemption, where the state law and federal law directly conflict such that the two together cannot coexist either because "compliance with both federal and state regulations is a physical impossibility" or there is "an inevitable collision between the two schemes of regulation."; and, (ii) field preemption, where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); *Orson*, 189 F.3d at 381–82. For the reasons set forth below, the court finds that the rationales that underlie both conflict and field preemption support a finding of preemption here. Because conflict preemption is more clearly applicable in this case, the court primarily relies on that type of preemption in finding that section 546(e) preempts the Committee's unjust enrichment claim.

The Committee seeks the same remedy under its unjust enrichment claim as that sought under its fraudulent transfer claim—to avoid the transactions and recover payments that were made in exchange for the tender of Hechinger shares by Hechinger shareholders. However, the court has found above that, pursuant to section 546(e), the Committee is barred from using its avoidance powers to recover payments made to shareholders in the Hechinger LBO transaction. *See, supra,* Section II.B.2.

If the court were to entertain the Committee's unjust enrichment claim, a claim that effectively acts as an avoidance claim against the shareholders in a transaction that the court has already found is an unavoidable settlement payment, and allowed the Committee to circumvent section 546(e) by asserting a state law claim for unjust enrichment based on the same facts and seeking essentially the same relief, the purpose of section 546(e) would be frustrated. *See Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 447–48 (1st Cir.2000) (finding state law unjust enrichment claim preempted by Code section 105, because allowing alternative state court remedy would conflict with congressional intent). Claims that Congress deemed unavoidable under sections 544(b) and 546(e) of the Bankruptcy Code can not be avoided by simply re-labeling avoidance claims as unjust enrichment claims; if they could, the exemption set forth in section 546(e) would be rendered useless. Because the Committee's unjust enrichment claim effectively acts as a section 544 fraudulent conveyance claim, it directly conflicts with the remedial exemption set forth in Code section 546(e). Allowing recovery for unjust enrichment here would implicate the same concerns regarding the unraveling of settled securities transactions more than one year after settlement, which is precisely the result that section 546(e) precludes.

Alternatively, the court also finds that the Committee's unjust enrichment claim is preempted because the Bankruptcy Code, particularly sections 544 and 546(e), provides an exclusive framework for addressing claims that seek to avoid transfers made more than one year before bankruptcy. Thus the Code preempts the field and precludes supplemental state remedies because the Code alone comprehensively addresses such claims.

The Bankruptcy Code addresses claims that seek to recover payments and provides a remedy for such claims. In section 544, it allows a debtor to avoid, under certain circumstances, payments that would be avoidable outside of bankruptcy by a creditor under state law. But the Code also explicitly limits and displaces state law by setting forth federal limits on the use of state law avoidance powers under section 544, providing that a settlement payment may not be avoided in bankruptcy. 11 U.S.C. § 546(e). By providing and circumscribing the remedies for the conduct alleged, Congress necessarily intended to displace inconsistent state law claims and remedies. Accordingly, because the Committee's unjust enrichment claim would effectively permit the avoidance of a settlement payment that Congress and the Third Circuit have said may not be avoided, the court finds that the claim is preempted based both on conflict and field preemption.

The Committee's arguments to the contrary do not convince the court that the Code does not preempt its unjust enrichment claim. In arguing that field preemption does not apply because the federal

regulations are not so pervasive as to exclude state remedies, the Committee asserts that "gaping voids" were left by Congress in the application of section 546(e) of the Bankruptcy Code. But, the court can find no such gaping voids in the applicability of section 546(e) within bankruptcy proceedings. To the contrary, the statute by its terms compels its application to every transaction that constitutes a "settlement payment" without exception. See 11 U.S.C. § 546(e); *Resorts International,* 181 F.3d at 516. Moreover, prior courts commenting on the province of the Bankruptcy Code have noted that the Code "reflects a balance, completeness and structural integrity that suggests remedial exclusivity." *Periera v. Chapman,* 92 B.R. 903, 908 (C.D.Cal.1988); *see also International Shoe v. Pinkus,* 278 U.S. 261, 265, 49 S.Ct. 108, 73 L.Ed. 318 (1929) (concluding that "[s]tates may not pass or enforce laws to interfere with or complement the Bankruptcy Act or provide additional or auxiliary regulations").

The one such "void" that the Committee identified in its briefing—that section 546(e) applies only to claims asserted in bankruptcy cases and not to fraudulent transfer claims asserted before a bankruptcy—is not a void at all. The inapplicability of section 546(e) to proceedings outside of bankruptcy is irrelevant as to whether section 546(e) completely occupies the field of proceedings within bankruptcy.[11] Where, as here, Congress has circumscribed the remedy for the specific conduct complained of, the court agrees with the defendants that Congress has occupied the field and rejected other possible

---

**11.** If the Committee were correct, that Congress could never be deemed to have occupied the field in enacting the Bankruptcy Code because, by definition, the Code governs only bankruptcy proceedings. This is not the case. Courts have found that the Code can occupy the field for claims that can be assert-

ed, as in this case, in bankruptcy or bankruptcy related proceedings. *See, e.g., Cox v. Zale Delaware, Inc.,* 239 F.3d 910, 913 (7th Cir. 2001); *Pertuso v. Ford Motor Credit Co.,* 233 F.3d 417, 426 (6th Cir.2000); *Bessette,* 230 F.3d at 447.

remedies. *See MSR Exploration Ltd. v. Meridian Oil, Inc.,* 74 F.3d 910, 914 (9th Cir.1996) ("Congress's authorization of certain sanctions for [a specific wrongful act] should be read as an implicit rejection of other penalties"); *see also Bessette,* 230 F.3d at 447–48. Even if the court were to agree with the Committee that field preemption is inappropriate in this case, because of the existence of some gaps in its scheme of bankruptcy regulation that the court and the parties have failed to see, it is nonetheless clear that conflict preemption applies.

Additionally, although the Committee's argues that its unjust enrichment claim does not conflict with Code section 546(e), the court finds these arguments to be unpersuasive. The Committee contends that Congress has expressly exempted from section 546(e) intentional fraudulent transfer claims arising under section 548(a)(1), and accordingly, that Congress demonstrated an intent to permit claims against a transferee under the facts alleged here. While the Committee is correct that section 548(a)(1) claims for intentional fraudulent transfers in which the transfer at issue occurred less than one year prior to bankruptcy, are exempted from the section 546(e) defense, the court cannot agree that this exemption demonstrates Congress's intent to allow unjust enrichment claims that effectively act as section 544 claims, and not as section 548(a)(1) claims. The Committee's fraudulent conveyance claims in this case were brought under section 544, the only section of the Code that provides for the avoidance of transactions that occurred more than a year before bankruptcy. With respect to those claims, it is clear that Congress has *not* exempted section 544 transfers from section 546(e). Rather, "Congress intended to prohibit recovery of settlement payments ... more than one year prepetition." *In re Hamilton Taft & Co.,* 176 B.R. 895, 901 (Bankr. N.D.Cal.1995). Allowing recovery via a claim for unjust enrichment would conflict with that statutory prohibition.

Therefore, the court agrees with the defendants that, in this instance, the Committee's unjust enrichment claim is preempted by section 546(e) of the Bankruptcy Code. Because the court finds that the Committee's unjust enrichment claim is preempted by section 546(e) of the Bankruptcy Code, the court need not consider the parties' arguments regarding whether the Committee has standing to bring the claim. The court will dismiss the unjust enrichment claim as to the Hechinger and England Family Defendants.

## III. CONCLUSION

First, having found that the "settlement payment" defense insulates the Hechinger LBO transaction from the avoidance powers of the Committee, the court will dismiss the Committee's fraudulent conveyance claims as to both the Hechinger Defendants and the England Family Defendants. Next, because the shares of the England Family Defendants were held in a voting trust pursuant to which they had no voting control over those shares, the court finds that they cannot be liable for breach of fiduciary duty and will dismiss the breach of fiduciary duty claim as to them. With respect to the Hechinger Defendants, the court will deny their motion to dismiss the breach of fiduciary duty claim as against them. Last, because the court finds that the Committee's unjust enrichment claim is preempted by section 546(e) of the Bankruptcy Code, the court will dismiss the unjust enrichment claim as to both sets of defendants.

The court will enter an order in accordance with this memorandum opinion.